ORAL ARGUMENT NOT YET SCHEDULED
No. 22-1217, 22-1218

# In the United States Court of Appeals for the District of Columbia Circuit

———————

SIERRA CLUB,
PETITIONER,

*V.*

U.S. DEPARTMENT OF ENERGY,
RESPONDENT.

———————

GOLDEN PASS LNG TERMINAL LLC AND MAGNOLIA LNG, LLC,
INTERVENORS FOR RESPONDENT.

———————

*ON PETITION FOR REVIEW OF ORDERS OF THE
UNITED STATES DEPARTMENT OF ENERGY*

———————

**FINAL BRIEF OF INTERVENOR–RESPONDENT
GOLDEN PASS LNG TERMINAL LLC**

———————

MICHAEL J. WOODRUM
*Winston & Strawn LLP*
2121 North Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500

JONATHAN D. BRIGHTBILL
SPENCER W. CHURCHILL
*Winston & Strawn LLP*
1901 L Street N.W.
Washington, D.C. 20036
(202) 282-5855
jbrightbill@winston.com

*Counsel for Intervenor Golden Pass LNG Terminal LLC*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

**(A)    Parties and Amici**

The parties are Sierra Club (Petitioner), the United States Department of Energy (Respondent), and the Intervenors—Magnolia LNG, LLC, the real party in interest to the underlying administrative proceeding in case 22-1217, and Golden Pass LNG Terminal LLC, the real party in interest to the underlying administrative proceeding in case 22-1218.  There are no amici.

Golden Pass LNG Terminal LLC is a joint-venture LNG-export company with no parent company.  An affiliate of QatarEnergy owns a 70% interest.  An affiliate of ExxonMobil owns a 30% interest.

**(B)    Rulings Under Review**

In case 22-1217, two orders are under review:

1. Order Amending Long-Term Authorization to Export Liquefied Natural Gas to Non-Free Trade Agreement Nations, Magnolia LNG LLC, DOE/FE Order No. 3909-C, FE Docket No. 13-132-LNG (April 27, 2022).  MR0172 [JA075].

2. Order Denying Request for Rehearing, Magnolia LNG LLC, DOE/FE Order No. 3909-D, FE Docket No. 13-132-LNG (June 24, 2022).  MR0197 [JA156].

In case 22-1218, two orders are under review:

1. Order Amending Long-Term Authorization to Export Liquefied Natural Gas to Non-Free Trade Agreement Nations, Golden Pass LNG Terminal LLC, DOE/FE Order No. 3978-E, FE Docket No. 12-156-LNG (April 27, 2022).  GR0141 [JA001].

2. Order Denying Request for Rehearing, Golden Pass LNG Terminal LLC, DOE/FE Order No. 3978-F, FE Docket No. 12-156-LNG (June 24, 2022).  GR0172 [JA065].

**(C)    Related Cases**

Golden Pass LNG Terminal LLC is unaware of any related cases.

## STATEMENT REGARDING ORAL ARGUMENT

Golden Pass LNG Terminal LLC requests oral argument, which will help resolve this appeal.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES.................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CONTENTS........................................................................ iv

TABLE OF AUTHORITIES .................................................................. vi

GLOSSARY OF ABBREVIATIONS ..................................................... ix

INTRODUCTION ............................................................................... 1

STATEMENT OF ISSUES ................................................................... 3

PERTINENT STATUTORY PROVISIONS ............................................ 3

STATEMENT OF THE CASE............................................................... 3

A.      DOE has confirmed its limited authority to determine that non-additive exports of LNG to non-FTA countries would not be consistent with the public interest. .................................................... 4

B.      FERC and DOE granted Golden Pass's initial LNG authorizations over Sierra Club's objections, without appeal................................. 8

C.      Sierra Club remained silent while DOE evaluated Golden Pass's application for non-additive, non-FTA export authorization. ...................... 11

SUMMARY OF ARGUMENT ............................................................. 13

STANDARD OF REVIEW ................................................................. 16

ARGUMENT ................................................................................... 17

I.       DOE lacks authority to deny non-FTA export applications based on upstream and downstream greenhouse gas emissions.................................. 17

       A.      The "public interest" in non-additive export authorizations concerns the economy and the LNG markets, not the environment.................................................... 18

B.     DOE did not fail to consider any legally relevant aspect of the problem. ............................................................................23

II.     Review of upstream and downstream emissions lies outside the scope of DOE's NEPA obligations, and it would be arbitrary and capricious for DOE to deny an export application based on that review. ......................27

A.     DOE's NEPA obligations, at most, regard the direct environmental effects during export of LNG to non-FTA countries. ..................................................................................28

B.     Sierra Club's alleged NEPA violations are irrelevant, and DOE should have applied Categorical Exclusion B5.7 on this record ...............................................................................30

C.     Sierra Club does not challenge Categorical Exclusion B5.7 on appeal.  Nevertheless, the forfeited arguments that it presented to the agency lack merit. ................................34

III.     Remand and vacatur would be inappropriate remedies for any minor defects the Court may find ...............................................................36

CONCLUSION .........................................................................................39

CERTIFICATE OF COMPLIANCE ........................................................41

CERTIFICATE OF SERVICE ..................................................................41

APPENDIX A ...........................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993).....................................................37, 39

*AT&T Servs., Inc. v. F.C.C. ,*
  21 F.4th 841 (D.C. Cir. 2021)..............................................................38

*Bowen v. Georgetown Univ. Hosp.,*
  488 U.S. 204 (1988).................................................................19, 31

*Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.,*
  467 U.S. 837 (1984).......................................................................23

*Colo. Interstate Gas Co. v. FERC.,*
  599 F.3d 698 (D.C. Cir. 2010)...........................................................17

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  140 S. Ct. 1891 (2020)...................................................................33

*\*Dep't of Transp. v. Pub. Citizen,*
  541 U.S. 752 (2004).................................................25, 28, 29, 31

*F.C.C. v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009).......................................................................22

*Fox Television Stations, Inc. v. F.C.C.,*
  280 F.3d 1027 (D.C. Cir. 2022)........................................................39

*Morrison v. Nat'l Austl. Bank,*
  561 U.S. 247 (2010).......................................................................22

*N. Baja Pipeline, LLC v. FERC,*
  483 F.3d 819 (D.C. Cir. 2007)..........................................................16

*NAACP v. Fed. Power Comm'n,*
  425 U.S. 662 (1976).......................................................................19

\*Authorities upon which Golden Pass chiefly rely are marked with asterisks.

*Nat'l Env't Dev. Assoc's Clean Air Project v. EPA,
  752 F.3d 999 (D.C. Cir. 2014)................................................................23, 33, 34

Nw. Austin Mun. Util. Dist. No. 1 v. Holder,
  557 U.S. 193 (2009)...........................................................................................21

*Pierce v. SEC,
  786 F.3d 1027 (D.C. Cir. 2015).........................................................16, 17, 26, 36

*Sierra Club v. FERC,
  827 F.3d 36 (D.C. Cir. 2016)............................................................27, 29, 30, 34

Sierra Club v. FERC,
  867 F.3d 1357 (D.C. Cir. 2017).........................................................................36

Sierra Club v. U.S. Dep't of Energy,
  857 F.3d 189 (D.C. Cir. 2017)...........................................................................16

Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,
  463 U.S. 29 (1983).......................................................................................17, 25

Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,
  435 U.S. 519 (1978)...........................................................................................25

West Virginia v. EPA,
  142 S. Ct. 2587 (2022).......................................................................................22

Whitman v. Am. Trucking Assocs.,
  531 U.S. 457 (2001)...........................................................................................21

**ADMINISTRATIVE ORDERS**

ConocoPhillips Alaska, Order No. 2500 ......................................................................7

Phillips Alaska, Order No. 1473, at 47 (citation omitted) ....................................6, 7

Sabine Pass, Order No. 2961 ..................................................................................6, 7

Yukon Pacific, Order No. 350 ....................................................................................7

**STATUTES**

*15 U.S.C. § 717b(a) ............ 4, 5, 6, 8, 13, 14, 18, 19, 20, 21, 23, 24, 26, 27, 30, 32

vii

*42 U.S.C. § 4332 ..........................................................................5, 28

**REGULATIONS**

*10 C.F.R. Pt. 1021, Subpt. D, App. B.......................................................
.................................... 2, 7, 8, 11, 12, 14, 15, 22, 23, 27, 30, 32, 33, 34, 35

10 C.F.R. § 1021.410 ......................................................................7

40 C.F.R. § 1500.1 .........................................................................7

40 C.F.R. § 1500.4(a).....................................................................7

40 C.F.R. § 1501.3(b) ..................................................................28

40 C.F.R. § 1501.4 .........................................................................7

40 C.F.R. § 1501.5 .........................................................................9

40 C.F.R. § 1501.6 .........................................................................9

40 C.F.R. § 1508.8(b) ..................................................................29

**OTHER AUTHORITIES**

Executive Order on Tackling the Climate Crisis at Home and Abroad,
E.O. 14,008 ...................................................................15, 18, 25, 36

*National Environmental Policy Implementing Procedures,
85 Fed. Reg. 78,197 (Dec. 4, 2020).....................................................5

Department of Energy Policy Guidelines,
49 Fed. Reg. 6684-01 (Feb. 22, 1984)...............................................6

Merrick B. Garland, *Deregulation and Judicial Review*,
98 Harv. L. Rev. 505, 570-71 (1985) .................................................16

# GLOSSARY OF ABBREVIATIONS

DOE          Department of Energy

DOE/FE       Department of Energy Office of Fossil Energy and Carbon Management

EA           Environmental Assessment

E.O.         Executive Order

FEIS         Final Environmental Impact Statement

FERC         Federal Energy Regulatory Commission

FTA          Free Trade Agreement

LNG          Liquefied Natural Gas

NGA          Natural Gas Act

NEPA         National Environmental Policy Act

Non-FTA      Non-Free Trade Agreement

## INTRODUCTION

The Department of Energy orders at issue in this case are narrow. They marginally increase the volume of natural gas that two liquefied natural gas terminals may export directly *to non-free-trade-agreement* countries. Under current DOE and FERC authorizations, Golden Pass LNG Terminal LLC ("Golden Pass") can already export its full terminal capacity to free-trade-agreement countries. The only issue now is the markets *where* this additional volume can go—not *whether* it can go at all. This decision has no environmental impact. Sierra Club has no standing.

But even if it did, and even if DOE erred procedurally when rejecting Sierra Club's rehearing request, remand for further administrative proceedings would be unnecessary and unfair. This Court should resolve the merits. Golden Pass dutifully submitted its application and timely made its record over the years. That record confirms this Court should deny Sierra Club's petition, in full. Golden Pass should not face the delay and expense of further DOE proceedings—particularly because DOE would commit legal error by reconsidering Golden Pass's authorization for the reasons Sierra Club now asserts.

For Sierra Club's petition is based on DOE's alleged failure to consider environmental impacts that lie outside DOE's statutory authority. The greenhouse gas emissions that Sierra Club complains about are within the jurisdiction of other federal agencies or foreign sovereigns. Congress delegated to DOE only narrow

discretion in the Natural Gas Act ("NGA"), concerning a narrow segment of the natural gas supply chain. DOE is merely examining if it is *not* in the public interest for non-additive natural gas to *also* be exported directly to non-FTA countries. Consequently, the NEPA analysis for LNG exports is likewise narrow. Indeed, in promulgating by rule Categorical Exclusion B5.7, DOE enshrined its regulatory interpretation of the NGA confirming that upstream, downstream, and cumulative greenhouse gas emissions are beyond DOE's statutory authority.

Yet Sierra Club complains that DOE erred by insufficiently looking at greenhouse gas emissions that the NGA gives DOE no authority to regulate. DOE's regulatory authority is limited. It concerns *where* natural gas may be exported, not *whether*. DOE has long properly focused its public interest analysis on economic factors. It would have been legal error for DOE to deny Golden Pass's authorization—or, once DOE granted that authorization on the legally relevant factors, to delay for rehearing—based on the environmental concerns that Sierra Club asserts.

The record before this Court is sufficient to dispose of Sierra Club's petition in full. Sierra Club's concerns are beyond the statutory authority of DOE. They are irrelevant to both DOE's "public interest" analysis and any NEPA analysis. The Petition should be denied in full, without remand.

2

## STATEMENT OF ISSUES

1.  Whether Section 3(a) of the NGA grants DOE the statutory authority to consider upstream, downstream, and cumulative greenhouse gas emissions as "an important aspect of the problem" when determining whether a request to authorize LNG export to a non-FTA country would not be consistent with the public interest.

2.  Whether, in light of DOE's declared limits on its statutory authority under Section 3(a), it was arbitrary and capricious for DOE to evaluate upstream, downstream, or cumulative greenhouse gas emissions—occurring outside of the jurisdiction of DOE to regulate—under NEPA when considering LNG export authorizations to a non-FTA country.

3.  Whether the Court should remand DOE's fully supported authorization for further proceedings simply because DOE—harmlessly—did not specifically address the substance of Sierra Club's previously rejected arguments.

## PERTINENT STATUTORY PROVISIONS

See Appendix A.

## STATEMENT OF THE CASE

Golden Pass is constructing a liquefied natural gas ("LNG") export terminal in Sabine Pass, Texas. Years ago, Golden Pass received authorization from FERC to construct the terminal. DOE authorized export of a set quantity of LNG to non-

3

Free Trade Agreement ("non-FTA") countries.  Golden Pass later received FERC authorization to expand the capacity of its Sabine Pass facility.  These earlier agency actions are not contested here.

This case relates to Golden Pass's subsequent application for DOE authorization to marginally increase the quantity of LNG exports allowed from the Sabine Pass facility *to non-FTA countries*.  Congress requires DOE to authorize export of LNG to FTA countries.

After receiving no adverse comments, protests, or intervention requests, DOE granted the increased non-FTA export authorization as unopposed.  Sierra Club then emerged late.  It filed a request for rehearing, challenging the increased authorization.  Sierra Club argued that DOE insufficiently considered upstream and downstream climate impacts that might result from increased exports.  DOE rejected Sierra Club's request because the group waited until after DOE completed its review and authorization to raise its objections.  DOE did not, however, respond to the merits of Sierra Club's rehearing issues.  Sierra Club petitioned for review.

**A.    DOE has confirmed its limited authority to determine that non-additive exports of LNG to non-FTA countries would not be consistent with the public interest.**

DOE administers Section 3(a) of the NGA, which governs import/export authorizations.  15 U.S.C. § 717b(a).  The Federal Energy Regulatory Commission separately administers Section 3(e), governing terminal siting, construction,

4

expansion, and operation.  *Id.* § 717b(e).  Because these agencies often evaluate different aspects of the same enterprise, they coordinate in conducting environmental reviews.  Thus, both FERC and DOE played a role in the reviews and authorizations necessary for Golden Pass to construct, operate, and export from its facility.

In "authorizing exports of domestically produced natural gas to foreign countries [that do not have free trade agreements with the United States]," DOE conducts environmental reviews according to the National Environmental Policy Act of 1969 ("NEPA").  National Environmental Policy Implementing Procedures, 85 Fed. Reg. 78,197, at 78,197 (Dec. 4, 2020) (citing 42 U.S.C. § 4332(C)).  NEPA regulations require DOE to "consider[] effects that are reasonably foreseeable and have a sufficiently close causal connection to the granting of the export authorization."  *Id.* (citing 40 C.F.R. § 1508.1(g); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004); *Sierra Club v. FERC*, 827 F.3d 36 (D.C. Cir. 2016) ("*Freeport I*")).  The extent of DOE's NEPA obligation, therefore, depends on the extent of its authority to approve exports under the NGA.  *Id.*

DOE has no authority under NGA Section 3(e) to approve construction of LNG facilities.  FERC administers that subsection.  *See id.*; *see also* 15 U.S.C. § 717b(e).  Moreover, Section 3(c) mandates that DOE authorize all LNG *imports*, as well as all exports to countries with which the United States has a free trade

agreement ("FTA countries"). 85 Fed. Reg. at 78,197 (citing 15 U.S.C. § 717b(c)). Thus, Section 3(a) narrowly grants DOE limited authority regarding whether to export LNG *to non-FTA countries*. *Id.* at 78,199. As DOE explains, such non-additive authorizations "do not increase the total volume of LNG the Companies may export, but only increase the number of countries to which exports are authorized." Gov. Br. 23.

Consistent with DOE's non-FTA export approvals concerning the markets *where* LNG may go, not *whether* it goes, DOE's analyses long focused on economic criteria, not environmental factors unaffected by the authorization. Those include:

> the domestic need for the [gas]; whether the proposed exports pose a threat to the security of domestic natural gas supplies; and any other issue determined to be appropriate, including whether the arrangement is consistent with DOE's policy of promoting competition in the marketplace by allowing commercial parties to freely negotiate their own trade arrangements.

GR0013 at 29 [JA168] (*Sabine Pass*, Order No. 2961). DOE "applies the principles described in the Secretary's natural gas import policy guidelines[,] which presume the normal functioning of the competitive market will benefit the public." *Phillips Alaska*, Order No. 1473, at 42 (citation omitted). DOE thus examines whether the proposed exports will be conducted on a market-responsive, competitive basis. 49

Fed. Reg. 6684-01 (Feb. 22, 1984) (hereinafter the "Policy Guidelines").[1]  DOE's export policies were "designed to establish natural gas trade on a market-competitive basis and to provide immediate as well as long-term benefits to the American economy from this trade."  Policy Guidelines, at 6684.

As part of its NEPA obligation, DOE has adopted various "categorical exclusions" by regulation.   85 Fed. Reg. at 78,197–98; *see also* 10 C.F.R. § 1021.410; 40 C.F.R. §§ 1500.1, 1500.4(a), 1501.4.   DOE can apply these to exclude categories of agency actions from project-specific NEPA review absent "extraordinary circumstances."   85 Fed. Reg. at 78,199 (citing 40 C.F.R. § 1501.4(b)).  One such categorical exclusion includes the "marine transport effects" of shipping LNG.  10 C.F.R. Pt. 1021, Subpt. D., App. B, B5.7.  DOE modified this exclusion B5.7, effective January 4, 2021.  85 Fed. Reg. at 78,197.  DOE examined studies of the environmental effects of marine transport of LNG and consulted "prior NEPA reviews and . . . technical reports."  85 Fed. Reg. at 78,198.  Through these studies, "DOE has determined that the transport of natural gas by marine vessel normally does not pose the potential for significant environmental impacts."  *Id.*

---

[1] The DOE/FE has repeatedly reaffirmed the continued applicability of the guidelines and has consistently held that they apply equally to export applications (though written to apply to imports).  *Yukon Pacific*, Order No. 350; *Phillips Alaska*, Order No. 1473; *ConocoPhillips Alaska*, Order No. 2500; GR0013 [JA167] (*Sabine Pass*, Order No. 2961).

DOE therefore amended Categorical Exclusion B5.7 effective January 2021 to address "[a]pprovals or disapprovals of new authorizations or amendments of existing authorizations to export natural gas under section 3 of the Natural Gas Act and any associated transportation of natural gas by marine vessel." *Id.* at 78,205; 10 C.F.R. Pt. 1021, Subpt. D., App. B., B5.7.

DOE's 2021 modifications facially narrowed the longstanding Categorical Exclusion B5.7.  It formerly applied more *broadly* to all "[i]mport or export natural gas, with operational changes." 10 C.F.R. Pt. 1021, Subpt. D., App. B, B5.7 (2012). When amending B5.7, DOE recognized that "NEPA do[es] not include effects that the agency has no authority to prevent.  DOE's discretionary authority under Section 3 of the NGA is limited to the authorization of exports of natural gas to non-FTA countries.   Therefore, DOE need not review potential environmental impacts associated with the construction or operation of natural gas export facilities because DOE lacks authority to approve the construction or operation of those facilities." 85 Fed. Reg. at 78,198/1.  Such impacts lie beyond DOE's NEPA obligations *de jure*, regardless of any categorical exclusion.  *Id.*

### B.   FERC and DOE granted Golden Pass's initial LNG authorizations over Sierra Club's objections, without appeal.

In December 2016, FERC authorized Golden Pass to construct and operate facilities in Texas for the export of LNG.  GR0056 [JA239].  FERC's authorization of Golden Pass's proposed export facilities under Section 3(e) followed a mandatory

NEPA pre-filing review process. As lead agency for the review under 15 U.S.C. § 717n(b), FERC prepared a final environmental impact statement ("FEIS").[2] DOE, the U.S. Environmental Protection Agency, the U.S. Army Corps of Engineers, the U.S. Department of Transportation, and the U.S. Coast Guard participated as cooperating agencies in preparing the FEIS.

To complete the FEIS, FERC issued drafts, held public meetings, and solicited comments. Sierra Club itself intervened in the FERC proceeding and protested the proposed LNG export facilities. The FEIS ultimately concluded that if Golden Pass constructed and operated the proposed facilities in accordance with applicable laws and regulations, adverse environmental impacts would be reduced to less-than-significant levels. The FEIS recommended adopting 83 Environmental Conditions, which FERC incorporated into the December 16, 2016 Order approving the proposed facilities. Sierra Club did not file a request for rehearing and did not appeal. Golden Pass did not challenge any condition.

In April 2017, DOE issued its import/export Order No. 3978. GR0058 [JA244]. That order authorized Golden Pass to export 808 billion cubic feet ("Bcf") per year of domestically produced natural gas from the proposed export terminal

---

[2] The lead agency has primary responsibility for preparation of the required NEPA documents and may request that other agencies having jurisdiction by law or special expertise serve as cooperating agencies. *See* 40 C.F.R. §§ 1501.5, 1501.6 (2022).

facilities approved in the FERC Order, including to non-FTA countries. *Id.* at 173 [JA326]. Order No. 3978 further granted Golden Pass authority to (1) engage in natural gas purchases and LNG sales for export and (2) act as agent for third parties.[3] *Id*. DOE conditioned Golden Pass's LNG export authorization on, among other things, a requirement that Golden Pass "ensure compliance with all terms and conditions established by FERC in the EIS, including the 83 conditions adopted in the FERC Order." *Id.* at 174 [JA327].

In May 2020, Golden Pass sought permission from FERC to increase the listed capacity of the proposed Sabine Pass facility. *See* GR0141 at 3 [JA006]. FERC issued a notice and awaited public comment. Nobody—including Sierra Club— opposed the application in the time allowed. *Id.* at 29 [JA032]. As before, FERC evaluated the environmental impact of the proposal—this time by preparing an environmental assessment, or EA. FERC once again determined that the Sabine Pass facility would not significantly affect the quality of the human environment. *Id.* at 31 [JA035]. FERC approved the expansion subject to four additional conditions recommended by the EA. *Id.*

---

[3] In September 2012, the DOE/FE had also granted Golden Pass authorization under Section 3 of the NGA for long-term, multi-contract authorization to export domestically produced LNG to FTA countries. GR0017 [JA174].

10

**C.    Sierra Club remained silent while DOE evaluated Golden Pass's application for non-additive, non-FTA export authorization.**

In August 2020, Golden Pass applied to DOE to increase non-FTA export volume from 808 Bcf to 937 Bcf. *Id.* at 1 [JA004]. This proposal affected the markets *where* Golden Pass could directly send the LNG—not *whether* Golden Pass could export the full capacity of the expanded Sabine Pass facility—because DOE had previously authorized an identical increase in export volumes to FTA countries. *See id.* at 3 [JA006]. Later, DOE made *two* determinations to apply Categorical Exclusion B5.7 to Golden Pass's applications. GR0116 [JA382]; GR0118 [JA384]. Just as with the FERC application, nobody, including Sierra Club, voiced opposition to the export application within the time allowed by DOE's public notice. GR0141 at 5 [JA008]. DOE concluded that granting the increase was *not* "inconsistent with the public interest." *Id.* DOE cited Categorical Exclusion B5.7 and the studies that underlie it. *Id.* at 22 [JA025]. DOE then granted the application in Order No. 3978-E. *Id.* at 53–56 [JA056–59].

After DOE granted Golden Pass's unopposed export-authorization request, Sierra Club requested rehearing. GR0147 [JA397]. Sierra Club made four main arguments in its request. *First*, according to Sierra Club, DOE should have considered the gross impact of the increased non-FTA export authorization on domestic emissions—*i.e.*, the "upstream effects" of the exports. *Id.* 3–4, 5–7, 15–16 [JA399-400, JA401-03, JA411-12]. *Second*, Sierra Club argued that DOE could

11

and should have estimated the global environmental impact of the increased non-FTA export authorization—*i.e.*, the "downstream effects" on climate change. *Id.* 4–5, 7–10, 15–16 [JA399–00, JA403–06, JA411-12]. *Third*, Sierra Club asserted that the related greenhouse gas studies relied on by DOE regarding such emissions were flawed. *Id.* 10–11; 16–19 [JA406-07; JA412-15]. And *fourth*, Sierra Club disagreed with DOE's use of the Russo-Ukrainian War as an example of the global need for U.S.-produced LNG. *Id.* 11–14 [JA407-10]. DOE had addressed and rejected the substance of the first three arguments when it issued its original export authorization to Golden Pass in 2017. GR0058 at 88–89, 92–94, 99–100, 102–35, 145–61 [JA263-63, JA267-69, JA270-71, JA273-35].

Golden Pass opposed Sierra Club's rehearing request. GR0170 [JA416]. Golden Pass explained that DOE had neither the authority nor the obligation under the NGA to consider upstream or downstream environmental effects. *Id.* 7–15, 20–25 [JA423-31, JA436-41]. DOE properly confirmed the limits of its authority when it modified Categorical Exclusion B5.7, effective January 2021. *Id.* 14–15, 24–25 [JA430-31, JA440-41] (citing 85 Fed. Reg. 78,198); *see, supra*, Part A. DOE should have applied Categorical Exclusion B5.7 in the instant case. *See* GR0170 at 20–23 [JA436-39]. Golden Pass showed that nothing in Sierra Club's arguments overcame the statutory presumption that increased non-FTA exports are within the public interest. *Id.* 15–20 [JA431-36]. Indeed, DOE would have committed legal error by

12

reconsidering Golden Pass's authorization on the grounds Sierra Club asserted. *Id.* at 7 [JA423]. Golden Pass also noted that Sierra Club's request was procedurally improper because Sierra Club waited until after DOE issued the order to present any of its arguments opposing Golden Pass's increased-non-FTA-export-authorization request. *Id.* 6–7 [JA422-23].

DOE denied Sierra Club's rehearing request because Sierra Club waited until rehearing to present its objections. Order No. 3978-F at 10 [JA074]. Sierra Club then petitioned this Court for review.

## SUMMARY OF ARGUMENT

Whether for lack of standing or on the merits, this Court should deny in full Sierra Club's petition. There should be no remand to DOE—even if DOE erred by denying Sierra Club's rehearing request on procedural grounds. DOE had no statutory authority to deny Golden Pass's export authorization on the grounds for which Sierra Club sought rehearing. It would have been error for DOE to reconsider Golden Pass's authorization on the grounds asserted by Sierra Club.

DOE's authority to grant or deny a non-FTA export authorization depends on the factors that Congress empowered DOE to evaluate when determining what would "not be consistent with the public interest" under NGA Section 3(a). DOE appropriately considers economic or energy security factors under this public interest determination but cannot lawfully consider Sierra Club's alleged

environmental impacts upstream or downstream from the actual export process that is subject to DOE jurisdiction.  The narrow environmental aspect of DOE's review falls under NEPA and is limited to actual export of LNG to non-FTA countries. DOE adequately evaluated (1) any NGA public-interest factors, and (2) any NEPA environmental impacts it had authority to consider.  Indeed, particularly once DOE found the legally relevant factors under Section 3(a) satisfied, it would have exceeded DOE's authority under the NGA to reconsider Golden Pass's authorization on the grounds Sierra Club advanced.   Further, the NEPA analysis actually conducted by DOE was superfluous in light of DOE's promulgated rule, Categorical Exclusion B5.7, which DOE should have followed.

After notice-and-comment rulemaking, DOE enshrined its interpretation of its regulatory authority under NGA Section 3(a) and its environmental obligations under NEPA in a regulation recognizing that there is "no information to indicate that natural gas export authorizations pose the potential for significant environmental impacts" within DOE's authority.  NEPA Rule, 85 Fed. Reg. 78201–02.  As a result of this determination, DOE Categorical Exclusion B5.7 eliminates the need for an EA or EIS under NEPA when approving LNG exports absent extraordinary circumstances.   10 C.F.R. Part 1021, Subpart D, App. B5.7.   By discussing information beyond Categorical Exclusion B5.7, DOE actually inappropriately conducted more environmental analysis than its regulations required and in

contravention of NEPA. Because Sierra Club's criticisms of the DOE's environmental review lie beyond DOE's jurisdiction and are contrary to Categorical Exclusion B5.7, its protests are irrelevant. DOE would have erred if it had reconsidered Golden Pass's application on grounds beyond Categorical Exclusion B5.7 and DOE's statutory authority. At most, Sierra Club complains of harmless errors regarding an exercise that did not need to be conducted in the first place.

Executive Order 14,008 does not change this analysis. By its own terms, the E.O. did not affect "the authority granted by law to an executive department or agency." *See Executive Order on Tackling the Climate Crisis at Home and Abroad*, E.O. 14,008 § 208. Because the E.O. cannot (and expressly did not) expand DOE's jurisdiction to consider environmental effects, the E.O. does not make such effects "an important aspect of the problem" requiring consideration, as Sierra Club alleges. Moreover, the E.O. does not give Sierra Club "any right or benefit, substantive or procedural, enforceable at law or in equity." *See* E.O. 14,008 § 301(c). Its implementation is a matter for the President and the executive branch, not the courts.

The merits of Sierra Club's arguments are ripe for decision, are case-dispositive, and should be decided. There should be no remand, because DOE had no authority or record to reconsider Golden Pass's authorization on the grounds Sierra Club asserted. DOE must reach the same result if the case were remanded. The petition should be denied in full.

15

**STANDARD OF REVIEW**

This Court reviews DOE's denial of Sierra Club's rehearing request for abuse of discretion. *Sierra Club v. U.S. Dep't of Energy*, 857 F.3d 189, 205 (D.C. Cir. 2017); *see also N. Baja Pipeline, LLC v. FERC*, 483 F.3d 819, 821 (D.C. Cir. 2007). With deference, the Court considers whether the agency's conclusions are "reasonable and reasonably explained." *N. Baja Pipeline*, 483 F.3d at 821. Nevertheless, "a reviewing court will uphold an agency action resting on several independent grounds if any of those grounds validly supports the result." *Pierce v. SEC*, 786 F.3d 1027, 1034 (D.C. Cir. 2015) (citation omitted). Thus, "if the result in a case is obvious, based on the record before the court and the rationale offered by the agency, 'the best course is for the reviewing court to simply apply the obvious result.'" *Id.* (quoting *Am. Fed'n of Gov't Employees v. FLRA*, 778 F.2d 850, 862 n.19, 250 U.S. App. D.C. 229 (D.C. Cir. 1985)); *see also* Merrick B. Garland, *Deregulation and Judicial Review*, 98 Harv. L. Rev. 505, 570–71 (1985) (vacating and remanding is not a logical response where there is only one conceivable outcome). The Court need "not agree with every ground upon which [the agency] has justified its decision." *Id.* at 1035.

When reviewing the agency's interpretation of a statute, the Court first asks whether the statutory language "unambiguously addresses the matter at issue." *Colo. Interstate Gas Co. v. FERC.*, 599 F.3d 698, 701 (D.C. Cir. 2010) (quoting

*Ameren Servs. Co. v. FERC*, 330 F.3d 494, 498 (D.C. Cir. 2003)).  If so, the language of the statute simply controls.  *Id.*  If not, then the Court defers to the reasonable interpretation of the agency.  *Id.*

**ARGUMENT**

Golden Pass agrees with DOE that this Court lacks jurisdiction.  Sierra Club's request for rehearing was also appropriately denied on procedural grounds.  If, however, the Court disagrees with DOE's arguments, there should be no remand. *See Pierce*, 786 F.3d at 1034.  The Court can and should address the merits.

DOE lacks authority under the NGA to deny export applications based on the upstream, downstream, and cumulative greenhouse gas emissions that Sierra Club complains were inadequately assessed.  If anything, DOE erred by even analyzing those effects under NEPA, as well.  It would have been error for DOE to reconsider Golden Pass's application on the grounds Sierra Club asserted.  The Court should deny the petition in full and not remand.

**I.    DOE lacks authority to deny non-FTA export applications based on up-stream and downstream greenhouse gas emissions.**

Sierra Club argues that upstream and downstream greenhouse gas emissions *not* resulting from the exportation process are "an important aspect of the problem" that DOE should consider under *State Farm*.  Pet. Br. 55–56 (citing *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Sierra Club suggests that DOE thus erred in approving Golden Pass's application and

17

should be "required to quantify domestic increases in greenhouse gas emissions, and to discuss the impact of continued approval of LNG exports on the United States' commitments to reduce domestic emissions." *Id*. That is incorrect. "To the contrary," as Golden Pass established in its Answer to Sierra Club's rehearing petition below, "reconsideration of the Order on account of the environmental effects that Sierra Club asserts would constitute legal error." GR0170 at 7 [JA423].

Under Section 3(a) of the NGA, DOE "shall" authorize natural gas exports to non-FTA countries "unless . . . it finds that the proposed exportation . . . will not be consistent with the public interest." 15 U.S.C. § 717b(a). In a notice-and-comment rulemaking, DOE itself interpreted its statutory authority as precluding DOE's consideration of upstream and downstream environmental effects when examining whether a terminal's LNG exports may be sold to non-FTA countries. NEPA Rule, 85 F.R. at 78,198. Executive Order 14,008 does not change that. The Court should reject as a matter of law—and without remand—Sierra Club's contention that DOE's public interest analysis failed to consider an important aspect of the problem.

### A. The "public interest" in non-additive export authorizations concerns the economy and the LNG markets, not the environment.

An implied premise of Sierra Club's petition is that DOE is empowered to weigh indirect upstream, downstream, and cumulative greenhouse gas emissions when analyzing whether non-FTA export applications are "not consistent" with "the public interest." *See* 15 U.S.C. § 717b(a). But DOE does not have that authority.

"It is axiomatic" that an agency's power "is limited to the authority delegated by Congress." *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). The NGA contains no definition of the "public interest." Nevertheless, the NGA's text, structure, and purpose and DOE's own regulatorily enacted interpretation confirm that DOE has no authority to consider the non-additive environmental effects of export authorizations to non-FTA countries.

*First*, the NGA's "principal purpose" is the "development of plentiful supplies of . . . natural gas" for combustion to produce energy. *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669–80 (1976). Consistent with its principal purpose, the NGA's text imposes a Congressional "presumption" in favor of "proposed exportation" of natural gas. *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017) ("*Freeport II*"). DOE "shall" authorize exports to non-FTA nations "*unless* . . . it finds that the proposed exportation . . . will not be consistent with the public interest." 15 U.S.C. § 717b(a) (emphasis added). The statute thus starts with a heavy thumb on the scale in favor of export of natural gas—which Congress fully knows and contemplates is intended to be combusted for energy or feeder stock for other products.

Moreover, after first enactment, Congress repeatedly amended the text of the NGA. These amendments further Congress's policy to import and export plentiful quantities of natural gas. Congress constrained DOE's discretion to determine

19

whether imports or exports are not consistent with the public interest.  Under NGA

Section 3(e), FERC now "shall have the *exclusive* authority to approve or deny an

application for the siting, construction, *expansion, or operation* of an LNG

terminal."  15 U.S.C. § 717b(e)(1) (emphasis added).  Section 201 of the Energy

Policy Act of 1992 amended NGA § 3(c) to require that applications to authorize the

*import* of natural gas be "deemed to be consistent with the public interest, and . . .

granted without modification or delay."  *See* 15 U.S.C. § 717b(c).  NGA § 3(c) then

requires that "*exportation* of natural gas to a nation with which there is in effect *a*

*free trade agreement* requiring national treatment for trade in natural gas, shall be

deemed to be consistent with the public interest."  15 U.S.C. § 717b(c) (emphases

added).  And DOE must grant FTA-export applications "without modification or

delay."  15 U.S.C. § 717b(c).  That leaves DOE with only a narrow scope of

remaining authority over non-FTA export authorizations.

*Second*, the NGA provides no textual indication that DOE can allow

environmental considerations to override the statute's "primary purpose" when

determining what would not be consistent with the public interest.  And reading that

authority into the sliver of discretion that DOE retains over non-FTA export

authorizations makes no sense.  DOE correctly explains that these authorizations are

granted on a "non-additive" basis.  Gov. Br. 7.  This "mean[s] that the volume an

exporter may export under its non-FTA authorization is not in addition to the amount

it may export under its FTA authorization." *Id.* "The Orders do not increase the total volume of LNG the Companies may export, but only increase the number of countries to which exports are authorized." Opp'n at 23. Congress has thus by statute already made the policy decision to authorize exports of LNG abroad— *whatever the volumes*—and thereby to accept their environmental impacts, *whatever they may be*.

To be sure, "public interest" is a malleable term. But Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 468 (2001). DOE's discretion to determine what is "not" in the "public interest" cannot be stretched to allow consideration of environmental effects of non-additive quantities of LNG that Congress has already authorized for export by statute.

*Third*, interpretative canons of statutory construction reinforce that DOE's authority must be limited. Based on "the principle of constitutional avoidance," *see Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193, 206 (2009), Section 3(a) should be construed in a manner that avoids the nondelegation problem.[4] And a

---

[4] *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 536 (2009) ("Congress must 'lay down by legislative act an intelligible principle,' and the agency must follow it." (*quoting Mistretta v. United States*, 488 U.S. 361, 374 (1989))).

nondelegation problem arises if DOE is allowed to offset Congress's primary purpose for the NGA with no intelligible principle for instead prioritizing environmental effects. There is also the presumption against the extraterritorial application of federal law. *Morrison v. Nat'l Austl. Bank*, 561 U.S. 247, 255 (2010). U.S. statutes do not apply in foreign territory unless Congress "clearly expressed" this intention. *Id.* That is precisely what Sierra Club seeks. It effectively asks DOE to consider restricting international use of U.S. LNG as incompatible with global climate goals by refusing authorization. And federal courts "expect Congress to speak clearly" if it wishes to assign to an executive agency a decision "of vast economic and political significance." *West Virginia v. EPA*, 142 S. Ct. 2587, 2605 (2022). Allowing DOE to wield the expansive power Sierra Club implies—moving well beyond largely economic and energy security considerations to potentially deny non-additive exports because of upstream, downstream, or cumulative worldwide environmental effects—would do exactly that.

*Fourth*, even if one assumes that DOE has some discretion to consider certain environmental effects (such as from the marine transport of gas), that authority is limited. It cannot be stretched beyond DOE's jurisdiction to the upstream and downstream emissions that Sierra Club asserts. DOE has confirmed this in notice-and-comment regulation. 10 C.F.R. Part 1021, Subpart D, App. B5.7; *see also* NEPA Rule, 85 Fed. Reg. 78198 (Dec. 4, 2020). When modifying Categorical

22

Exclusion B5.7 in its regulations, DOE explained that its assessment of environmental impacts under NEPA "is properly focused on potential environmental impacts resulting from the exercise of its NGA section 3 authority." 85 Fed. Reg. at 78198. And "[t]he *only* decision *for which DOE has authority* is with respect to the export of the commodity itself." *Id.* at 78199 (emphases added). To the extent there is any ambiguity in the governing statutes—and there is not—courts should defer to DOE's regulatorily enacted interpretation of its own authority. *Chevron, U.S.A., Inc. v. Nat'l res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984). And, of course, it is "axiomatic . . . that an agency is bound by its own regulations"—DOE should have relied on Categorical Exclusion B5.7. *Nat'l Env't Dev. Assoc's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *Panhandle E. Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979)). Upstream, downstream, and cumulative environmental effects are beyond DOE's authority under Section 3(a).

**B.    DOE did not fail to consider any legally relevant aspect of the problem.**

Sierra Club's contention that DOE failed to consider "an important aspect of the problem" is based on DOE's alleged failure to consider the "United States' commitments to reduce domestic emissions" of greenhouse gases. Pet. Br. 55. It says, "The indirect domestic emissions associated with the particular exports authorized here are themselves significant," and "the cumulative problem is tremendous." *Id.* at 56–57. This not only fails to cite an error by DOE, but DOE

23

would have committed legal error by reconsidering Golden Pass's authorization on such factors.

As just explained, even DOE concedes it has no authority to consider any environmental effects beyond those narrowly occurring within the scope of DOE's Section 3(a) jurisdiction.  To start, FERC "shall have the *exclusive* authority to approve or deny an application for the siting, construction, *expansion, or operation* of an LNG terminal."  15 U.S.C. § 717b(e)(1) (emphasis added).  The NGA itself facially halts DOE's authority to look upstream.  Thereafter, DOE may only examine "the potential environmental impacts starting at the point of delivery to the export vessel, and extending to the territorial waters of the receiving country."  85 Fed. Reg. 78199–200.  Thus, Sierra Club's further demand that DOE review the purported indirect and cumulative effects from downstream LNG use and combustion—the Congressional purpose for the Natural Gas Act—are likewise beyond this scope. There is no limiting principle for this agency departure, into an area of vast economic and political significance, based on non-additive extraterritorial uses of the gas.

By the same logic applied by the Supreme Court in *Public Citizen* regarding NEPA, an agency cannot be said to have ignored "an important aspect of the problem" under *State Farm* if that problem is beyond the agency's authority.  *See Pub. Citizen*, 541 U.S. at 767–69.  Nor can the federal courts require (at Sierra Club's request) that DOE quantify greenhouse gas emissions, discuss them, or explain their

role in federal climate policy unless Congress required that. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 546 (1978) (barring courts from establishing "extra procedural devices" for agencies).

Presidential Executive Order 14,008 does not change the analysis. To the extent the President has called on executive agencies to consider upstream or downstream greenhouse gas emissions, when they can, this is an issue internal to the Executive Branch. The E.O. expressly states that it does not affect "the authority granted by law to an executive department or agency." E.O. 14,008 § 301(a)(1). Nor does the E.O. empower Sierra Club to invoke the courts to enforce the President's desire for DOE to consider environmental effects within the limits of DOE's statutory authority. By its own terms, Executive Order 14,008 "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." E.O. 14,008 § 301(c). Thus, it grants Sierra Club no rights that the courts can—consistent with separation of powers—require DOE to address on remand. In fact, the E.O. does not even mention exports of any kind, and its only directive about natural gas goes to the Secretary of the Interior. *See* E.O. 14,008 § 208 (Jan. 27, 2021).

Sierra Club's purported demand that DOE address its objections about the Russo-Ukrainian War is a contrived makeweight.  It fails to manufacture a changed circumstance that might establish DOE's "public interest" finding was inadequate. That war is merely one "example" of the global instabilities that DOE invoked as justifying plentiful export of U.S. LNG worldwide.  GR0141 at 39 [JA042].  And export is the policy that Congress presumes should occur through the NGA anyway. DOE's decision that export was not inconsistent with the public interest in no way depended on Russia's invasion of Ukraine.  *Id.* 39–40 [JA042-43].  At worst, any disregard of this issue by DOE was a completely harmless error.

In sum, Sierra Club acknowledges that "nothing prohibits [DOE] from approving LNG exports even when those exports would conflict with or complicate federal climate policy."  Pet. Br. 56.  But Sierra Club is mistaken that NGA Section 3(a) conversely *allows* DOE to consider—and thereby conceivably deny—a non-FTA export authorization on such grounds.  DOE has no such authority.  Sierra Club doesn't just fail to identify a legally relevant, "important aspect of the problem" that DOE overlooked.  On the record below, DOE would have committed legal error by reconsidering authorization based on Sierra Club's concerns.  Here, it is the "best course . . . for the reviewing court to simply apply the obvious result."  *See Pierce*, 786 F.3d at 1034.  The petition should be denied, in full, regardless of any purported procedural errors by DOE.

II.    **Review of upstream and downstream emissions lies outside the scope of DOE's NEPA obligations, and it would be arbitrary and capricious for DOE to deny an export application based on that review.**

Sierra Club further criticizes DOE's NEPA analysis. It complains about DOE's alleged reliance "on documents prepared outside the NEPA process, and not cited in a NEPA document, to meet its NEPA obligations." Specifically, Sierra Club claims that DOE's "actual NEPA documents" "provide no discussion whatsoever of the upstream and downstream impact of exports." Pet. Br. 50. Those allegations are wrong—for all the reasons already stated by DOE. Gov. Br. 53–58. But Sierra Club's contentions suffer from a more fundamental problem. An agency need not consider environmental effects when it "has no regulatory authority." *Freeport I*, 827 F.3d at 48 (quoting *Pub. Citizen*, 541 U.S. at 769). Because, as previously established, upstream, downstream, and cumulative greenhouse gas emissions are beyond DOE's Section 3(a) authority, consideration of such impacts are also outside DOE's NEPA obligations. *Id.* Furthermore, DOE more than adequately addressed the NEPA requirements by promulgating Categorical Exclusion B5.7.

Here, too, no further proceedings should occur. Given that DOE has already determined that Golden Pass's export application is consistent with the public interest based on the legally relevant factors, it would have been arbitrary and capricious for DOE to reconsider the authorization once granted for purported NEPA reviews that DOE is not obligated to undertake.

### A.    DOE's NEPA obligations, at most, regard the direct environmental effects during export of LNG to non-FTA countries.

NEPA requires a federal agency to prepare an Environmental Impact Statement, or EIS, when it undertakes "major Federal actions significantly affecting the quality of the human environment." *Pub. Citizen*, 541 U.S. at 757 (quoting 42 U.S.C. § 4332(2)(C)).   The Council of Environmental Quality, or CEQ, "has promulgated regulations to guide federal agencies in determining what actions are subject to that statutory requirement." *Id.*  If the proposed action would not "clearly require the production of an EIS," it may be the subject of a more limited Environmental Analysis, or EA. *Id.* (citing 40 C.F.R. § 1501.4(a)).  "If, pursuant to the EA, an agency determines that an EIS is not required under applicable CEQ regulations, it must issue a 'finding of no significant impact,' which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Id.* at 757–58.  Alternatively, if the proposed action would not "clearly require the production of an EIS," it may be categorically excluded from this requirement. *Id.* at 757 (citing 40 C.F.R. § 1501.4(a)).

"In considering whether *the effects of the proposed action* are significant, agencies shall analyze the potentially affected environment and degree of the effects of *the action*." 40 C.F.R. § 1501.3(b) (emphases added).  Thus, the appropriate level of NEPA analysis—categorical exclusion, EA, EIS, or nothing—depends on the

specific "action" before an agency and the effects that are "caused by" agency action and "reasonably foreseeable."  40 C.F.R. § 1508.8(b).

The causal standard here is analogous to "the 'familiar doctrine of proximate cause from tort law,'" *Pub. Citizen*, 541 U.S. at 767 (quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983)).  There must be a "reasonably close causal relationship"—beyond mere "but-for" causation—"between the environmental effect and the alleged cause."  *Pub. Citizen*, 541 U.S. at 767; *Freeport I*, 827 F.3d at 46.  Thus "the underlying policies or legislative intent [help] draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not."  *Pub. Citizen*, 541 U.S. at 767.

Ultimately, "NEPA's core focus" is "improving agency decisionmaking."  *Id.* at 769 n.2.  Under the "rule of reason," agencies must scope their NEPA analyses "based on the usefulness of any new potential information to the decisionmaking process."  *Id.* at 754.  "Where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect."  *Id.* at 770.  The agency "need not consider" such effects under NEPA or the implementing CEQ regulations.  *Id.* As the D.C. Circuit has put it, "a decision over which the [agency] has no regulatory authority" "breaks the NEPA causal chain and absolves the [agency] of responsibility to include in its NEPA analysis considerations that it 'could not act

on' and for which it cannot be 'the legally relevant cause.'" *Freeport I*, 827 F.3d at

48 (quoting *Pub. Citizen*, 541 U.S. at 769).  DOE's NEPA obligations thus extend

only as far as its authority under the NGA.

Guided by this properly limited scope of both DOE's Section 3(a) authority

and its NEPA obligations, DOE regulations provide for categorical exclusions from

NEPA's EIS requirements without an EA.  One applies to "[a]pprovals or

disapprovals of new authorizations or amendments of existing authorizations to

export natural gas under section 3 of the Natural Gas Act and any associated

transportation of natural gas by marine vessel."  10 C.F.R. Part 1021, Subpart D,

App. B5.7.  Based on "some 50 years of experience" and other data, DOE had "no

information to indicate that natural gas export authorizations pose the potential for

significant environmental impacts."  85 Fed. Reg. at 78201–02.  By applying

Categorical Exclusion B5.7, DOE would have complied with NEPA's requirement

to take a "hard look" at the potential environmental effects of its orders granting non-

FTA export authorizations.  It should have done so in the instant case.

### B. Sierra Club's alleged NEPA violations are irrelevant, and DOE should have applied Categorical Exclusion B5.7 on this record.

Sierra Club criticizes DOE because "the actual NEPA documents—FERC's

2020 Environmental Assessment for Golden Pass . . . provide[d] no discussion

whatsoever of the upstream or downstream impacts of exports."  *Id.* at 50.  This,

however, is wrong.

DOE is correct that its process was sufficient to comply with NEPA's requirements. More fundamentally though, DOE had no obligation to consider Sierra Club's alleged broad climate impacts under NEPA. As previously established, *see*, *supra*, Part I, DOE does not have authority to act on upstream, downstream, or cumulative environmental impacts. Thus, whatever consideration DOE gave to such matters was voluntary and superfluous. Akin to the Department of Transportation in *Public Citizen*, DOE "simply lacks the power to act on whatever information might be contained in" any further upstream, downstream, or cumulative greenhouse gas analysis. *See Pub. Citizen*, 541 U.S. at 768. Therefore, any purported error in its discussion was harmless. On this basis alone, the Court should not remand for further review of these legally incorrect allegations.

Moreover, on this record, it would be erroneous for DOE to now reconsider and further delay Golden Pass's application based on the alleged NEPA violations that Sierra Club belatedly asserted. GR0141 at 22–23 [JA025-26]. An agency "is limited to the authority delegated by Congress." *Bowen*, 488 U.S. at 208. Having weighed all legally relevant factors to determine whether Golden Pass's non-FTA export modification would not be consistent with the public interest, it would have been arbitrary and capricious and erroneous for DOE to assent to Sierra Club's request for DOE to reconsider and further delay (let alone deny) that approval for further "NEPA" analyses of effects that DOE has no authorization to act upon.

31

The lack of any rational basis for DOE to conduct further NEPA analysis on remand is confirmed by DOE's prior determinations that Golden Pass's project falls within a class of actions that can be excluded from project-specific NEPA analyses by Categorical Exclusion B5.7.  GR0116 [JA382]; GR0118 [JA384].  This exclusion now concerns "[a]pprovals or disapprovals of new authorizations or amendments of existing authorizations to export natural gas under section 3 of the Natural Gas Act and any associated transportation of natural gas by marine vessel."  10 C.F.R. Pt. 1021, Subpt. D., App. B., B5.7.  Previously, the exclusion applied more *broadly* (textually) to all "[i]mport or export natural gas, with operational changes."  10 C.F.R. Pt. 1021, Subpt. D., App. B, B5.7 (2012).

DOE has since revised Categorical Exclusion B5.7 "to focus exclusively on the analysis of potential environmental impacts resulting from activities occurring at or after the point of export."  NEPA Rule, 85 F.R. at 78197.  The revision actually *narrowed* the scope of environmental considerations that DOE considers legally relevant.  So now there is even less rational basis for denying that the Categorical Exclusion B5.7 should apply to Golden Pass.  Yet DOE previously determined that proposed exports for the Golden Pass project (1) fit within the class of actions for B5.7, (2) do not involve any "extraordinary circumstances," and (3) have not been segmented, thus providing for application of the Categorical Exclusion.  GR0116 [JA382]; GR0118 [JA384].

Given its determination that Golden Pass's requested exports fit within Categorical Exclusion B5.7, DOE was bound to apply it. *See Nat'l Env't Dev. Assoc.*, 752 F.3d at 1009 ("[An] agency is not free to ignore or violate its regulations while they remain in effect." (quoting *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 526 n.20 (D.C. Cir. 1978)). When it adopted B5.7, DOE laid out the grounds for its conclusion that (1) it lacks authority to regulate upstream and downstream environmental effects and (2) the "transport of natural gas by marine vessel normally does not pose the potential for significant environmental effects." NEPA Rule, 85 F.R. at 78,198. Those grounds now bind DOE. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020). DOE cannot reverse course on B5.7 without critically assessing and adequately explaining the reasons for doing so. *See id.* 1913–15. If DOE were to ignore B5.7 and deny Golden Pass's application here, it would depart from its own regulations and selectively rescind B5.7 without reasoned decisionmaking. That is the definition of arbitrary and capricious agency action. *See id.* 1915; *Nat'l Env't Dev. Assoc.*, 752 F.3d at 1009. The Court should not remand for further proceedings on a reconsideration petition that DOE could not grant without erring. The petition should be denied entirely.

**C.    Sierra Club does not challenge Categorical Exclusion B5.7 on appeal.  Nevertheless, the forfeited arguments that it presented to the agency lack merit.**

In its motion for rehearing before the agency, Sierra Club did halfheartedly try to dispute the import of DOE's Categorical Exclusion B5.7, and DOE's promulgation of it.  If Sierra Club belatedly raises such arguments in its reply, this Court should consider such arguments forfeited for not asserting the issue in its opening.  In any event, Sierra Club's attacks on the categorical exception fail.

*First*, Sierra Club argued that Categorical Exclusion B5.7 is unlawful because DOE in some way "misunderstood" its own "authority and ability to foresee the consequences of LNG exports."  GR0147 at 18 [JA414].  Sierra Club offered no textual authority nor binding case law to support this.  Instead, it cited a case about FERC that is consistent with DOE's position here.  *Id.* (citing *Freeport I*, 827 F.3d at 40–41, 46).  *Freeport I* affirms that an agency need not evaluate the environmental effects of activities outside its regulatory authority.  827 F.3d at 47 (holding that FERC need not evaluate environmental effects of natural gas exports because that activity is regulated solely by DOE).  Categorical Exclusion B5.7 reflects that principle.  It is now DOE's regulation, and it binds DOE.  *Nat'l Env't Dev. Assoc's Clean Air Project*, 752 F.3d at 1009 ("[A]n agency is bound by its own regulations.").

*Second*, Sierra Club offered no factual basis for its argument that Categorical Exclusion B5.7 is inapplicable under 10 C.F.R. Part 1021, Subpart D, App. B(4). GR0147 at 19 [JA415].  This regulation requires an individualized assessment of a proposal with "the potential to cause *significant* impacts on environmentally sensitive resources," such as listed species.  10 C.F.R. Part 1021, Subpart D, App. B(4) (emphasis added).  Sierra Club invoked this regulation based on the EA's indication that the exports have "the potential to impact listed species."  GR0147 at 19 [JA415].  But Sierra Club did not allege, and the EA does not suggest, that the proposed exports' potential effect on listed species would be "significant."  *See id.*; GR0110 at 9–12 [JA376-79].  The record proves that the regulation on which Sierra Club relied is inapplicable.[5]

Thus, even if Sierra Club tries to resurrect its forfeited arguments and dispute the adequacy of Categorical Exclusion B5.7 in its Reply, those arguments would fail. The Categorical Exclusion would have provided all the NEPA review that could be required of DOE.  DOE already found twice that Categorical Exclusion B5.7 applied to Golden Pass's application.  GR0116 [JA382]; GR0118 [JA384].  DOE, therefore, should have applied Categorical Exclusion B5.7 in the instant case.  And DOE lacks

---

[5] Moreover, the potential effect on listed species is already being addressed by the National Marine Fisheries Service.  *See* GR0121 at ¶ 11 [JA389].

the authority to reconsider its export authorizations based on upstream and downstream greenhouse gas emissions as Sierra Club wishes.[6]

Executive Order 14,008 also does not impact the appropriateness of DOE's NEPA analysis. As explained above, the E.O. expressly stated that it did not affect "the authority granted by law to an executive department or agency." E.O. 14,008 § 301(a)(1). And the E.O. singled out only the Secretary of the Interior for specific instructions related to natural gas. E.O. 14,008 § 208. The E.O. does not change DOE's authority (or obligation).

## III. Remand and vacatur would be inappropriate remedies for any minor defects the Court may find.

If the Court concludes that DOE erred by its procedural response to Sierra Club's rehearing request, it should not remand. *See Pierce*, 786 F.3d at 1034. The merits of Sierra Club's petition are ripe for decision. The Court should reach those merits, and not subject Golden Pass to the burden and expense of further DOE proceedings and customer uncertainty regarding the non-FTA export authorization that DOE would have erred by reconsidering.

---

[6] Some cases predating DOE's interpretation of Section 3 incorrectly assume the opposite. *See, e.g.*, *Freeport II*, 867 F.3d at 1371. *Freeport II*, however, concerned FERC's authority—not DOE's far more narrow authority. And such analyses are now obsolete because the court did not have the benefit of DOE's current regulations interpreting Section 3 of the NGA.

In no event should this Court vacate DOE's order in connection with any remand. "The decision whether to vacate [an agency order] depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (quoting *Int'l Union, UMW v. FMSHA*, 920 F.2d 960, 967 (D.C. Cir. 1990)). Here, those factors weigh strongly against vacatur.

*First*, Sierra Club notably fails to allege that there will be any environmental harm or impact without vacatur pending remand. (Indeed, Sierra Club lacks injury and standing.) Even Sierra Club appears to recognize that DOE's expanded export authorization to non-FTA countries merely expands the markets *where* Golden Pass can export directly. DOE's authorization does not impact *whether* Golden Pass can export increased quantities of LNG. Throughout its brief, Sierra Club strains to imply that stopping Golden Pass's authorization for non-FTA countries will stop the export of LNG (and so its subsequent use and emission of greenhouse gas downstream). That is not correct because, as DOE emphasizes in its brief, its Orders approving exports to FTA and non-FTA countries are non-additive and only concern the countries to which exports are permitted, not the volumes. Gov. Br. 23. Sierra Club itself asserts that any incremental export increase to non-FTA countries is unlikely "until 2026 or 2027." Pet. Br. 58.

37

*Second*, vacating DOE's non-FTA authorization would harm Golden Pass. Vacatur of DOE's non-FTA export authorization will not affect the quantity of LNG that Golden Pass can export. But the Order does affect the scope of markets where Golden Pass's LNG can be directly sold and contracts established for a portion of its LNG capacity. Vacatur would, therefore, disrupt Golden Pass's current LNG sales contracts and upset valuable business relationships.

Given the broad, worldwide need for LNG—a highly valued commodity providing efficient, reliable energy with far lower carbon emissions than the coal it often replaces—Sierra Club nowhere disputes that both FTA and non-FTA countries will demand and draw the full operational export capacity of the Golden Pass terminal for the foreseeable future. Vacating the order on any remand would provide no benefit to Sierra Club in terms of reducing LNG exports. It would disrupt Golden Pass's contracts and business relationships with customers, especially in non-FTA nations. *Cf. AT&T Servs., Inc. v. F.C.C.*, 467 841, 854–55 (D.C. Cir. 2021) (acknowledging that vacating agency order would significantly disrupt services provided to mobile devices under existing provider contracts).

*Third*, Sierra Club does not establish that the alleged procedural errors justify harm to Golden Pass. *See AT&T Servs.*, 21 F.4th at 854–55 ("Here both factors favor remand without vacatur."). As detailed above, Sierra Club asserted no material NEPA or other violations below. Thus, DOE would almost certainly reach the same

conclusion again. *See Fox Television Stations, Inc. v. F.C.C.*, 280 F.3d 1027, 1049 (D.C. Cir. 2002) ("[T]he probability that the Commission will be able to justify retaining the NTSO Rule is sufficiently high that vacatur of the Rule is not appropriate."). As Sierra Club itself admits, it has repeatedly presented most of its arguments to DOE in response to past applications, and DOE has time and again rejected them. Pet. Br. 42–45. In fact, Sierra Club presented those arguments when it objected to Golden Pass's original non-FTA export authorization before DOE. *Id.* Tellingly, Sierra Club did not then appeal.

In short, DOE "chose correctly" in authorizing the increase in non-FTA export capacity for Golden Pass, *Allied-Signal, Inc.*, 988 F.2d at 150–51, even though it did not rely upon Categorical Exclusion B5.7. Vacating DOE's authorization at this time would achieve no environmental benefit but would unnecessarily harm Golden Pass.

## CONCLUSION

If the Court were to conclude that Sierra Club has standing, the Court should reach the merits and *not* remand for further administrative proceedings. It should deny the petition and affirm the orders of the Department of Energy authorizing increased exports of Golden Pass LNG to non-FTA countries.

June 8, 2023

Respectfully submitted,

*/s/ Jonathan D. Brightbill*
Jonathan D. Brightbill
Spencer W. Churchill
Winston & Strawn LLP
1901 L Street NW
Washington, D.C. 20036
(202) 282-5855
jbrightbill@winston.com

Michael J. Woodrum
Winston & Strawn LLP
2121 North Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500

*Counsel for Golden Pass LNG Terminal LLC*

## CERTIFICATE OF COMPLIANCE

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    ☒    this brief contains 9,097 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒    this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2013 in 14-point Times New Roman.

*/s/ Jonathan D. Brightbill*
JONATHAN D. BRIGHTBILL

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2023, I caused the foregoing BRIEF to be served on all counsel of record through the Court's ECF filing system.

*/s/ Jonathan D. Brightbill*
JONATHAN D. BRIGHTBILL

# APPENDIX A

**15 U.S.C. § 717b:**

### (a) Mandatory authorization order

After six months from June 21, 1938, no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

### (b) Free trade agreements

With respect to natural gas which is imported into the United States from a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, and with respect to liquefied natural gas--

> (1) the importation of such natural gas shall be treated as a "first sale" within the meaning of section 3301(21) of this title; and

> (2) the Commission shall not, on the basis of national origin, treat any such imported natural gas on an unjust, unreasonable, unduly discriminatory, or preferential basis.

### (c) Expedited application and approval process

For purposes of subsection (a), the importation of the natural gas referred to in subsection (b), or the exportation of natural gas to a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public interest, and applications for such importation or exportation shall be granted without modification or delay.

**(d) Construction with other laws**

Except as specifically provided in this chapter, nothing in this chapter affects the rights of States under--

> (1) the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.);

> (2) the Clean Air Act (42 U.S.C. 7401 et seq.); or

> (3) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.).

**(e) LNG terminals**

> (1) The Commission shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal. Except as specifically provided in this chapter, nothing in this chapter is intended to affect otherwise applicable law related to any Federal agency's authorities or responsibilities related to LNG terminals.

> (2) Upon the filing of any application to site, construct, expand, or operate an LNG terminal, the Commission shall--

> (A) set the matter for hearing;

> (B) give reasonable notice of the hearing to all interested persons, including the State commission of the State in which the LNG terminal is located and, if not the same, the Governor-appointed State agency described in section 717b-1 of this title;

> (C) decide the matter in accordance with this subsection; and

> (D) issue or deny the appropriate order accordingly.

> (3)

>> (A) Except as provided in subparagraph (B), the Commission may approve an application described in paragraph (2), in whole or part, with such modifications and upon such terms and conditions as the Commission find1 necessary or appropriate.

43

(B) Before January 1, 2015, the Commission shall not--

(i) deny an application solely on the basis that the applicant proposes to use the LNG terminal exclusively or partially for gas that the applicant or an affiliate of the applicant will supply to the facility; or

(ii) condition an order on--

(I) a requirement that the LNG terminal offer service to customers other than the applicant, or any affiliate of the applicant, securing the order;

(II) any regulation of the rates, charges, terms, or conditions of service of the LNG terminal; or

(III) a requirement to file with the Commission schedules or contracts related to the rates, charges, terms, or conditions of service of the LNG terminal.

(C) Subparagraph (B) shall cease to have effect on January 1, 2030.

(4) An order issued for an LNG terminal that also offers service to customers on an open access basis shall not result in subsidization of expansion capacity by existing customers, degradation of service to existing customers, or undue discrimination against existing customers as to their terms or conditions of service at the facility, as all of those terms are defined by the Commission.

**(f) Military installations**

(1) In this subsection, the term "military installation"--

(A) means a base, camp, post, range, station, yard, center, or homeport facility for any ship or other activity under the jurisdiction of the Department of Defense, including any leased facility, that is located within a State, the District of Columbia, or any territory of the United States; and

44

(B) does not include any facility used primarily for civil works, rivers and harbors projects, or flood control projects, as determined by the Secretary of Defense.

(2) The Commission shall enter into a memorandum of understanding with the Secretary of Defense for the purpose of ensuring that the Commission coordinate and consult2 with the Secretary of Defense on the siting, construction, expansion, or operation of liquefied natural gas facilities that may affect an active military installation.

(3) The Commission shall obtain the concurrence of the Secretary of Defense before authorizing the siting, construction, expansion, or operation of liquefied natural gas facilities affecting the training or activities of an active military installation.

## 42 U.S.C. § 4332:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall--

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--

(i) the environmental impact of the proposed action,

45

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any

alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.1

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.