NOT YET SCHEDULED FOR ORAL ARGUMENT

Nos. 22-1217 & 22-1218

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

SIERRA CLUB,
*Petitioner*,

v.

UNITED STATES DEPARTMENT OF ENERGY,
*Respondent.*

_____

On Petition for Review of Orders of the Department of Energy,
Office of Fossil Energy and Carbon Management

_____

**BRIEF OF RESPONDENT
UNITED STATES DEPARTMENT OF ENERGY**

_____

TODD KIM
  *Assistant Attorney General*

Of counsel:                          JUSTIN D. HEMINGER
                                     CHRISTOPHER ANDERSON
BETTINA MUMME                          *Attorneys*
  *Attorney*                         Environment & Natural Resources Div.
Office of General Counsel            U.S. Department of Justice
U.S. Department of Energy            Post Office Box 7415
                                     Washington, DC 20044
                                     (202) 353-1834
                                     christopher.anderson3@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties and Amici

All parties, intervenors, and amici appearing in this Court are listed in the Opening Brief for Sierra Club.

### B.     Rulings Under Review

References to the rulings at issue appear in the Brief for Sierra Club.

### C.     Related Cases

There are no other related cases.

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases....................................... i

Table of Contents................................................................................ ii

Table of Authorities ........................................................................... v

Glossary ......................................................................................... xi

Introduction...................................................................................... 1

Statement of Jurisdiction ..................................................................... 2

Statement of Issues ............................................................................ 3

Pertinent Statutes and Regulations ........................................................ 4

Statement of the Case ......................................................................... 5

    A. Statutory and Regulatory Background........................................... 5

        1. The Natural Gas Act.......................................................... 5

        2. Energy's Review of Applications to Export LNG.......................... 7

        3. Energy's Procedures for Reviewing Natural Gas
           Act Applications........................................................... 10

    B. The Companies' Applications to Export LNG. ................................12

        1. The Golden Pass Proceedings................................................12

           a. Prior Proceedings on Golden Pass's Initial
             Application for Export Authorization ....................................12

           b. Proceedings on Golden Pass's Application to
             Export Additional Volumes of LNG (Proceedings
             Under Review)..............................................................13

        2. The Magnolia Proceedings .................................................15

           a. Prior Proceedings on Magnolia's Initial
             Application for Export Authorization ....................................15

           b. Proceedings on Magnolia's Application to Export
             Additional Volumes of LNG (Proceedings Under
             Review) ....................................................................16

3. Petitions for Review ...................................................... 17

Summary of Argument ........................................................ 17

Standard of Review .......................................................... 21

Argument ........................................................................ 22

I.   This Court Lacks Jurisdiction to Hear Sierra Club's
     Petitions. .................................................................... 22

     A. Sierra Club Lacks Article III Standing. ........................... 22

     B. This Court Lacks Jurisdiction Because Sierra Club
        Was Not a Party to the Proceedings. .............................. 27

II.  Sierra Club Failed to Raise Its Objection in Accordance
     with Energy's Rules, and Energy Reasonably Denied
     Rehearing on that Ground. ............................................. 30

     A. Energy's Procedural Rules Require Objections to Be
        Raised in a Timely Protest or Motion to Intervene,
        Unless Good Cause Is Shown for Late Filing. .................. 30

        1. The Natural Gas Act Explicitly Grants Energy the
           Authority to Promulgate Procedural Rules. ................. 30

        2. Energy's Rules Specify the Method and Time for
           Raising Objections to an Application. ........................ 32

        3. Even If Energy's Rules Are Ambiguous, Energy's
           View Is Entitled to Deference. ................................ 39

     B. Sierra Club Had Adequate Notice That It Had to
        Present Its Arguments in a Timely Protest or Motion
        to Intervene ............................................................. 40

     C. Sierra Club Did Not Show Good Cause for Its Tardy
        Objections, and Energy Acted Reasonably by Refusing
        to Consider Them. ..................................................... 43

        1. There Was No "Good Cause" for Sierra Club to
           Wait Until Rehearing to Raise Its Arguments. ............. 43

iii

2. Sierra Club's Comments on Studies Are Not an Adequate Substitute for Raising Objections to an Application. ................................................................ 47

III. The Court Should Decline to Address, or Reject, Sierra Club's Piecemeal Challenges to the Export Orders ............................. 50

A. If the Court Determines that Energy's Denial of the Request for Rehearing Was Arbitrary, It Should Remand Without Vacating the Authorizations. ............................... 50

B. Sierra Club's NEPA and *State Farm* Arguments Do Not Show the Orders Were Arbitrary ................................. 53

1. Energy Properly Incorporated the Supplemental Environmental Studies into Its NEPA Analysis. ......................... 53

2. Energy Was Not Required to Assess the Potential Effect of the Orders on Domestic Greenhouse Gas Reduction Targets. ...................................................... 58

Conclusion ................................................................. 60

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Allied-Signal Inc. v. Nuclear Regul. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) .................................................................. 52

*Am. Farm Lines v. Black Ball Freight Serv.*,
   397 U.S. 532 (1970) ....................................................................................... 39

*Am. Tel. & Tel. Co. v. FCC*,
   454 F.3d 329 (D.C. Cir. 2006) .................................................................. 42

*ASARCO, Inc. v. FERC*,
   777 F.2d 764 (D.C. Cir. 1985) ...................................................... 27, 44, 50

*Barnhart v. Walton*,
   535 U.S. 212 (2002) ..................................................................................... 39

*BellSouth Corp. v. FCC*,
   162 F.3d 1215 (D.C. Cir. 1999) ................................................................. 48

*Blumenthal v. FERC*,
   613 F.3d 1142 (D.C. Cir. 2010) .......................................................... 37, 38

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ..................................................................................... 21

*Clapper v. Amnesty Int'l USA*,
   *568* U.S. 398 (2013) .................................................................................. 25

*Clark-Colwitz Joint Operating Agency v. FERC*,
   826 F.2d 1074 (D.C. Cir. 1987) ........................................................... 42, 43

*Crete Carrier Corp. v. EPA*,
   363 F.3d 490 (D.C. Cir. 2004) ................................................................. 25

*Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs,*
   869 F.3d 148 (3d Cir. 2017) ...................................................... 48

*Dominion Transmission, Inc. v. FERC,*
   533 F.3d 845 (D.C. Cir. 2008) .................................................... 3

*Exxon Corp. v. FERC,*
   114 F.3d 1252 (D.C. Cir. 1997) ................................................. 31

*Fla. Audubon Soc'y v. Bentsen,*
   94 F.3d 658 (D.C. Cir. 1996) ..................................................... 24

*Fleming v. Dep't of Agric.,*
   987 F.3d 1093 (D.C. Cir. 2021) ........................................... 31, 34

*Fried v. Hinson,*
   78 F.3d 688 (D.C. Cir. 1996) ..................................................... 39

*Friends of the River v. FERC,*
   720 F.2d. 93 (D.C. Cir. 1983) ..................................................... 57

*Gen. Elec. Co. v. EPA,*
   290 F.3d 377 (D.C. Cir. 2002) .................................................... 51

*Green Country Mobilephone, Inc. v. FCC,*
   765 F.2d 235 (D.C. Cir. 1985) .................................................... 48

*Gulf S. Pipeline Co. v. FERC,*
   955 F.3d 1001 (D.C. Cir. 2020) ........................................... 36, 37

*Hunt v. Wash. State Apple Advert. Comm'n,*
   432 U.S. 333 (1977) ................................................................. 22

*INEOS USA LLC v. FERC,*
   940 F.3d 1326 (D.C. Cir. 2019) ................................................. 43

*King v. Palmer,*
   950 F.2d 771 (D.C. Cir. 1991) ................................................... 42

*Kisor v. Wilkie,*
  139 S. Ct. 2400 (2019)................................................................. 39

*La. Ass'n of Indep. Producers v. FERC,*
  958 F.2d 1101 (D.C. Cir. 1992) ................................................... 5

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992)..................................................................... 22

*Marks v. United States,*
  430 U.S. 188 (1977)..................................................................... 42

*Mayo v. Reynolds,*
  875 F.3d 11 (D.C. Cir. 2017)....................................................... 55

*Me. Pub. Utils. Comm'n v. FERC,*
  454 F.3d 278 (D.C. Cir. 2006)......................................................21

*Minisink Residents for Env'tl Pres. & Safety v. FERC,*
  762 F.3d 97 (D.C. Cir. 2014)....................................................... 37

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)...............................................21, 52, 53, 59

*Nat. Res. Def. Council v. Nuclear Regul. Comm'n,*
  879 F.3d 1202 (D.C. Cir. 2018) .................................................. 57

*Oglala Sioux Tribe v. Nuclear Regul. Comm'n,*
  45 F.4th 291 (D.C. Cir. 2022)..................................................... 58

*Price v. Barry,*
  53 F.3d 369 (D.C. Cir. 1995)....................................................... 34

*Pub. Serv. Comm'n v. Fed. Power Comm'n,*
  284 F.2d. 200 ............................................................................. 27

*Ramsey v. Comm'r of Soc. Sec.,*
  973 F.3d 537 (6th Cir. 2020)....................................................... 42

*Sierra Club v. Dep't of Energy,*
  (*Freeport II*), 867 F.3d 189 (D.C. Cir. 2017).................6, 21, 55, 56, 58, 60

*Sierra Club v. EPA,*
  292 F.3d 895 (D.C. Cir. 2002) ................................................................ 22

*Sierra Club v. FERC,*
  (*Sabine Pass*), 827 F.3d 59 (D.C. Cir. 2016)............................................ 26

*Sierra Club v. FERC,*
  867 F.3d 1357 (D.C. Cir. 2017) ............................................................... 55

*Sims v. Apfel,*
  530 U.S. 103 (2000) ................................................................................41

*Tenet HealthSystems HealthCorp. v. Thompson,*
  254 F.3d 238 (D.C. Cir. 2001) ................................................................ 39

*Tenn. Gas Pipeline v. FERC,*
  871 F.2d 1099 (D.C. Cir. 1989)........................................................... 27, 30

*Util. Workers Union of Am. Loc. 464 v. FERC,*
  896 F.3d 573 (D.C. Cir. 2018) ................................................................ 25

*Venetian Casino Resort, LLC v. Nat'l Lab. Rels. Bd.,*
  793 F.3d 85 (D.C. Cir. 2015) .................................................................. 50

*Vt. Dep't of Pub. Serv. v. United States,*
  684 F.3d 149 (D.C. Cir. 2012) ...........................................................31, 34

*Woodford v. Ngo,*
  548 U.S. 81 (2006) ................................................................................. 48

## **Statutes**

15 U.S.C. § 717b.......................................................................................... 6, 23

15 U.S.C. § 717n....................................................................................... 5, 27, 30

15 U.S.C. § 717r ................................................................ 3, 11, 12, 18, 21, 27, 44

5 U.S.C. § 706 ...............................................................................................21

## Regulations

10 C.F.R. § 590.102........................................................................11, 28, 36

10 C.F.R. § 590.106 ............................................................................... 29

10 C.F.R. § 590.108 ................................................................................ 32

10 C.F.R. § 590.201 ................................................................................ 10

10 C.F.R. § 590.205 ................................................................................ 11

10 C.F.R. § 590.303 ........................................................11, 18, 19, 28, 33

10 C.F.R. § 590.304 ................................................ 11, 19, 32, 34, 35, 44

10 C.F.R. § 590.310 ......................................................................10, 11, 12

10C.F.R. § 590.316.................................................................................12

10 C.F.R. § 590.404 .........................................................................12, 36

10 C.F.R. § 590.501.......................................................................... 11, 12, 36

10 C.F.R. § 590.505 ............................................................................... 36

40 C.F.R. § 1502.20 (2019) ................................................................. 54

40 C.F.R. § 1502.21 (2019) ................................................................. 55

40 C.F.R. § 1508.10 (2019) ................................................................. 54

## Other Authorities

Executive Order 14,008, Tackling the Climate Crisis at Home
    and Abroad, 86 Fed. Reg. 7,619 (Jan. 27, 2021)..................................44, 60

Import and Export of Natural Gas; New Administrative
    Procedures, 49 Fed. Reg. 35,302 (Sept. 6, 1984)..............30, 32, 33, 34, 36

Import and Export of Natural Gas; New Administrative
    Procedures; Proposed Rule46 Fed. Reg. 44,696
    (Sept. 4. 1981) ........................................................................... 32, 33

# GLOSSARY

| | |
|---|---|
| Commission | Federal Energy Regulatory Commission |
| EIS | Environmental Impact Statement |
| Energy | Department of Energy |
| FTA Countries | Countries with which the United States has in effect a free trade agreement requiring national treatment for trade in natural gas |
| GR___ | Record item number, as enumerated in the Index to Record for Case 22-1218 (Golden Pass) |
| JA___ | Joint Appendix |
| LNG | Liquefied Natural Gas |
| MR___ | Record item number, as enumerated in the Index to Record for Case 22-1217 (Magnolia) |
| NEPA | National Environmental Policy Act of 1969 |
| Non-FTA Countries | Countries with which the United States does not have in effect a free trade agreement requiring national treatment for trade in natural gas |
| SC Br. | Opening Brief for Petitioner Sierra Club |

**INTRODUCTION**

In April 2022, the Department of Energy, Office of Fossil Energy and Carbon Management ("Energy"), approved applications by Golden Pass LNG Terminal LLC ("Golden Pass") and Magnolia LNG LLC ("Magnolia") (collectively, "the Companies") to increase their existing authorizations to export liquefied natural gas ("LNG") under section 3(a) of the Natural Gas Act. More specifically, those approval orders increased the volume of LNG the Companies are authorized to export to "non-FTA countries," that is countries with which the United States does not have in effect a free trade agreement requiring national treatment for trade in natural gas.

In years-long proceedings before Energy, petitioner Sierra Club, a frequent participant in proceedings on LNG export authorizations, gave no indication that it objected to the Companies' applications. It did not file protests or motions to intervene by Energy's published deadlines, nor did it move for leave to submit late protests for good cause. Only after Energy issued final orders approving the applications, did Sierra Club—on the last possible day—seek rehearing. Sierra Club did not acknowledge, much less attempt to justify, its failure to object earlier.

Concerned for the integrity of its proceedings, Energy declined to consider Sierra Club's belated objections, explaining that condoning Sierra

1

Club's delay would "undermin[e] the public interest in administrative efficiency and finality and render[] its comment period meaningless." JA073; JA163. Energy also observed that entertaining out-of-time objections without justification would "exacerbate fairness and due process concerns for parties seeking finality in administrative decisions." JA073; JA163.

Sierra Club would now have this Court set aside as arbitrary that entirely predictable procedural ruling. But the Court lacks subject-matter jurisdiction both because Sierra Club lacks standing and because Sierra Club never became a party to the proceedings on the Companies' applications. Even if this Court were to determine that it has jurisdiction, Energy's procedural ruling was sound. Sierra Club's position conflicts with the orderly and efficient administrative process set out in Energy's procedural rules, and Sierra Club's reasons for failing to comply with those rules lack legal support, as the dearth of authority cited by Sierra Club demonstrates. The Court should affirm Energy's authority to manage its proceedings and deny the petitions.

## STATEMENT OF JURISDICTION

Sierra Club seeks review of Energy's orders issued under section 3(a) of the Natural Gas Act in April 2022, authorizing the Companies to export

2

LNG to certain countries, as well as Energy's denial in June 2022 of Sierra Club's applications for rehearing of those orders (collectively, the "Orders").

Sierra Club filed timely petitions for review on August 22, 2022. *See* 15 U.S.C. § 717r(b). This Court nonetheless lacks jurisdiction over the petitions for two reasons: First, Sierra Club does not have Article III standing. Second, Sierra Club was not a party to the proceedings leading to the Orders. 15 U.S.C. § 717(r)(b); *see also Dominion Transmission, Inc. v. FERC*, 533 F.3d 845, 851 (D.C. Cir. 2008).

## STATEMENT OF ISSUES

1. Whether this Court has jurisdiction to decide Sierra Club's petitions for review.

    a. Whether Sierra Club has standing to challenge the Orders when it has not shown that they will result in increased LNG exports from the Companies' facilities and therefore failed to show the Orders will harm its members.

    b. Whether Sierra Club was a party to the export authorization proceedings when it only intervened in earlier, concluded proceedings but did not move to intervene in the proceedings leading to the Orders.

2. Whether Energy rationally denied Sierra Club's applications for rehearing because Sierra Club failed to meet deadlines established by

Energy's procedural rules for raising objections to export applications and offered no good cause for that failure.

3.a.    If the Court decides Energy's denial of Sierra Club's requests for rehearing was arbitrary, whether the Court should decline to address Sierra Club's arguments on the merits and remand the Orders so that Energy can consider Sierra Club's arguments in the first instance.

b.    If the Court decides to reach the merits of Sierra Club's petition, whether either of the errors asserted by Sierra Club renders the export authorizations arbitrary:

1.    Whether Energy correctly incorporated by reference certain supplemental environmental studies into its review under the National Environmental Policy Act of 1969 ("NEPA").

2.    Whether Energy, in issuing export authorizations under section 3(a) of the Natural Gas Act, was required as part of its public interest analysis to address national greenhouse gas emissions reduction targets.

**PERTINENT STATUTES AND REGULATIONS**

Pertinent statutes and regulations are attached in an addendum.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

#### 1.    The Natural Gas Act

Congress enacted the Natural Gas Act in 1938. Pub. L. 109-58, 119 Stat. 688 (Jun. 21, 1938). The Act authorized the then-existing Federal Power Commission to regulate the interstate sale and transportation of natural gas, as well as natural gas imports and exports. In 1977, Congress enacted the Department of Energy Organization Act, Pub. L. No. 95-91, 91 Stat. 565 (Aug. 4, 1977), creating the Department of Energy and the Federal Energy Regulatory Commission ("Commission") and transferring the Federal Power Commission's authorities to those agencies. *See La. Ass'n of Indep. Producers v. FERC*, 958 F.2d 1101, 1120 (D.C. Cir. 1992). Energy now administers section 3(a) of the Natural Gas Act, which governs import and export authorizations, while the Commission administers section 3(e), which governs LNG terminal siting authority, and other provisions. *See id.* at 1120. As a result, approvals for export projects must be sought in separate proceedings before the Commission and Energy. Although the proceedings are separate, the Natural Gas Act requires the Commission to coordinate environmental review for both approvals, with Energy participating as a cooperating agency. 15 U.S.C. § 717n(b).

5

Section 3(a) of the Act requires Energy's authorization for the import or export of natural gas, but provides that Energy "shall" grant such authorization, "unless, after opportunity for hearing, [Energy] finds that the proposed exportation or importation will not be consistent with the public interest." 15 U.S.C. § 717b(a). Section 3(c) further provides that the exportation of natural gas to nations "with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public interest, and applications for such importation or exportation shall be granted without modification or delay."[1] *Id.* § 717b(c). Thus, as to free trade agreement countries ("FTA Countries"), export authorization is mandated, *id.*, and as to non-FTA Countries, there is a "general presumption favoring . . . authorization," *Sierra Club v. Dep't of Energy* (*Freeport II*), 867 F.3d 189, 203 (D.C. Cir. 2017).

Because the standards differ for granting authorizations to export to FTA versus non-FTA Countries, Energy typically grants exporters separate

---

[1] The United States currently has in effect free trade agreements requiring national treatment for trade in natural gas with Australia, Bahrain, Canada, Chile, Colombia, Dominican Republic, El Salvador, Guatemala, Honduras, Jordan, Mexico, Morocco, Nicaragua, Oman, Panama, Peru, Republic of Korea, and Singapore. *See* https://www.energy.gov/fecm/how-obtain-authorization-import-andor-export-natural-gas-and-lng (citing https://ustr.gov/trade-agreements/free-trade-agreements).

authorizations for each group of destination countries. Energy grants those authorizations on a "non-additive" basis in accordance with the maximum capacity of the applicant's liquefaction facility, meaning that the volume an exporter may export under its non-FTA authorization is not in addition to the amount it may export under its FTA authorization. *See Freeport LNG Expansion LP*, Docket No. 10-161-LNG, Order No. 3282 (Dep't of Energy May 17, 2013), JA208–09 (establishing the principle of granting FTA and non-FTA authorizations on a non-additive basis). So, for example, if Energy granted an exporter one authorization to export 100 billion cubic feet per year of LNG to FTA Countries and a second authorization to export 100 billion cubic feet per year of LNG to non-FTA Countries, the exporter would be limited to exporting 100 billion cubic feet per year in total, which could be allocated in any proportion between FTA and non-FTA Countries throughout the term of the authorizations. Energy issued all the export authorizations at issue in these petitions on a non-additive basis.

## 2.  Energy's Review of Applications to Export LNG

Before 2010, the United States was almost exclusively an importer of LNG. Following advances in extraction technology, however, the United States began to produce natural gas in quantities that made export of LNG from the continental United States economical. Beginning around 2010, the

Commission and Energy began receiving applications requesting authority to construct natural gas liquefaction and export facilities and to export domestically produced LNG from those facilities. Since then, Energy has issued more than 150 long-term authorizations approving the export of natural gas in the form of LNG, compressed natural gas, or compressed gas liquid to FTA Countries, non-FTA Countries, or both (under consolidated orders). There are currently eighteen export applications pending before Energy, involving proposed exports of U.S. LNG from both U.S.-based projects and extraterritorial projects proposed for construction in Mexico.[2]

Although Energy evaluates each application on its own merits, applications to export LNG present common issues, including the macroeconomic and environmental effects of authorizing exports. To address those common issues efficiently and in a manner that is fair to all applicants, Energy commissioned a series of studies to inform its public interest evaluation. To address the economic aspects of the public interest standard, Energy commissioned studies evaluating the likely effect of LNG exports on U.S. energy markets and the U.S. economy more broadly. JA010–17; JA085–92 (summarizing the economic studies).

---

[2] *See* Summary of LNG Export Applications (Mar. 14, 2023), https://www.energy.gov/fecm/articles/summary-lng-export-applications-lower-48-states.

Energy also commissioned a series of studies examining the potential environmental effects associated with increased natural gas production for export, as well as the possible effects of increased LNG exports on global greenhouse gas emissions. In 2014, Energy commissioned the first of those studies, the "Addendum to Environmental Review Documents Concerning Exports of Natural Gas from the United States" ("Addendum"), to consider potential environmental impacts from shale-gas production and other unconventional production that export demand may induce. JA220–21. The Addendum also addressed "upstream" greenhouse gas emissions, that is, the greenhouse gas emissions associated with the production and transportation of natural gas before liquefaction and export. JA223.

To address potential effects on global greenhouse gas emissions, Energy commissioned the "Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas from the United States," which it published in May 2014 ("Life Cycle Analysis"). That study concluded that exporting U.S. LNG to produce power in Europe and Asia would not increase greenhouse gas emissions above what would be expected if those regions relied instead on regional coal power, and that potential differences in greenhouse gas emissions between U.S. LNG and other sources of

natural gas are largely "indeterminate" because of uncertainty in the modeling data. JA281–83; JA519–21.

In 2019, Energy published an update to the Life Cycle Analysis ("2019 Update"). The conclusions of the 2019 Update track those of the earlier report. While acknowledging uncertainty, the 2019 Update concluded that, when U.S. LNG exports displace coal in importing nations, U.S. LNG exports are likely to reduce global greenhouse gas emissions for power production and that, when U.S. LNG exports displace other forms of imported natural gas, they are likely to have only a small effect on global greenhouse gas emissions. JA351.

The Addendum, Life Cycle Analysis, and 2019 Update are referred to collectively in this brief as the "Supplemental Environmental Studies."

### 3.    Energy's Procedures for Reviewing Natural Gas Act Applications

Energy's Administrative Procedures with Respect to the Import and Export of Natural Gas are codified at 10 C.F.R. pt. 590. Those rules establish an adversarial procedure for the development of an administrative record, which forms the basis of Energy's final determination in the matter.

Under Energy's rules, an applicant seeking authorization to export (or import) LNG initiates the authorization process by filing an application. *Id.* § 590.201. Upon receipt of the application, Energy publishes a Notice of

Application in the Federal Register summarizing the proposal. *Id*.
§ 590.205(a). The Notice also sets deadlines for interested persons to
submit motions to intervene, protests, or comments. *Id*. §§ 590.205(b),
.303(d), .304(e), .310. Ordinarily, the deadline is not less than thirty days
from the date of the Notice. *Id*. § 590.205(a). For applications requesting
authorization for long-term exports, such as those at issue in these
petitions, Energy sets a deadline of sixty days from the Notice of
Application. JA368; JA562.

Any "person"[3] may submit a protest, *id*. §§ 590.303(b), .304(a), but a
person seeking to become a party must move to intervene, *id*. § 590.303(b).
Only parties have the right to apply for rehearing and to seek judicial
review. *Id*. § 590.501(a); *accord* 15 U.S.C. § 717r. After the deadlines set out
in the Notice of Application have passed, motions to intervene, protests,
and comments are entertained only "for good cause shown." 10 C.F.R.
§§ 590.303(d), .304(e). Any party may answer a motion to intervene or
protest within fifteen days of filing. *Id*. § 590.303(e), .304(f).

Once the written submissions are complete, Energy may hold
additional procedures, such as evidentiary hearings or oral presentations.

---

[3] "Person" is defined broadly to include individuals, business associations,
non-governmental organizations, and units of federal, state, or local
government. 10 C.F.R. § 590.102(m).

*Id.* § 590.310. If no party requests additional procedures and Energy determines none are required (as has been the case in export proceedings to date), Energy proceeds to issue a final opinion and order based on the administrative record, including the application and all other filings. *Id.* § 590.316. "The final opinion and order shall be based solely on the official record of the proceeding and include a statement of findings and conclusions, as well as the reasons or basis for them, and the appropriate order, condition, sanction, relief or denial." *Id.* § 590.404. Any party "aggrieved" by an order may apply for rehearing within thirty days of that order. *Id* § 590.501(a); *see also* 15 U.S.C. § 717r(a).

### B.    The Companies' Applications to Export LNG.

#### 1.    The Golden Pass Proceedings

##### a.    Prior Proceedings on Golden Pass's Initial Application for Export Authorization

In August 2012, Golden Pass applied to Energy for authorization to export up to 740 billion cubic feet per year of natural gas to FTA Countries from its existing LNG terminal located in Jefferson County, Texas. JA175. Energy granted the application in September 2012. JA180.

In October 2012, Golden Pass applied for authorization to export the same quantity of LNG to non-FTA Countries on a non-additive basis. In February 2013, Sierra Club filed a motion to intervene, protest, and

comment in that proceeding, which Energy granted. JA307. To fulfill its NEPA responsibilities, Energy participated as a cooperating agency in the Commission's preparation of an Environmental Impact Statement ("EIS") for the Commission's review of Golden Pass's parallel application to the Commission for approval to construct its liquefaction and export facilities. Energy subsequently adopted the Commission's EIS for purposes of Golden Pass's export application. JA309.

On April 25, 2017, Energy issued an order granting Golden Pass authorization to export to non-FTA Countries. JA326–31. Sierra Club filed a timely request for rehearing of that order, which Energy denied. JA334–37. Sierra Club did not seek judicial review.

### b. Proceedings on Golden Pass's Application to Export Additional Volumes of LNG (Proceedings Under Review)

Three years later, in May 2020, Golden Pass applied to the Commission to increase the authorized LNG production capacity of its facility from 740 to 937 billion cubic feet per year. JA006–07. The proposed capacity increase resulted solely from refined engineering calculations and process improvements; Golden Pass did not propose any modifications to the facility design or additional construction. JA381. As part of its review of that application, the Commission prepared an

Environmental Assessment, dated November 2020. Once again, Energy participated as a cooperating agency. JA007. The Commission approved the amendment in January 2021. *Id.*

In August 2020, Golden Pass submitted a new application to Energy for authorization to export LNG to FTA and non-FTA Countries in the increased quantity approved by the Commission. JA366–67. Sierra Club did not file a motion to intervene or a protest in the proceedings on either of those requests. Energy granted the requested authorization to export to FTA Countries in June 2021. JA395–96. On April 27, 2022, Energy granted authorization to export the increased quantity to non-FTA Countries on a non-additive basis. JA056. Along with that order, Energy also issued a Finding of No Significant Impact under NEPA, which adopted and incorporated by reference the Environmental Assessment prepared by the Commission. JA060–64.

On May 27, 2022, Sierra Club applied for rehearing of the April order, and on June 24, 2022, Energy denied that request on the ground that Sierra Club had not filed a timely protest to the application but had instead waited until rehearing to object. JA070–74.

14

### 2.    The Magnolia Proceedings

### a.    Prior Proceedings on Magnolia's Initial Application for Export Authorization

In March 2013, Magnolia began the prefiling process with the Commission for authorization to construct a new LNG export facility near Lake Charles, Louisiana. JA473. As part of its review of Magnolia's construction application, the Commission completed an EIS for the project in November 2015. Energy participated as a cooperating agency in the preparation of the EIS. JA472. The Commission granted Magnolia's requested authorization in April 2016. JA495–96.

Magnolia applied to Energy in October 2013 for authorization to export up to 394.2 billion cubic feet per year of LNG to non-FTA Countries, on a non-additive basis, from the Lake Charles facility. JA502–03. Energy had previously authorized Magnolia to export the same quantity of LNG to FTA Countries. JA503.[4] In May 2014, Sierra Club timely moved to intervene, protest, and comment in the proceeding, and Energy granted Sierra Club's motion. JA538–39. Energy granted Magnolia's requested authorization to export to non-FTA Countries in November 2016. JA544.

---

[4] Magnolia received two additive authorizations to export LNG to FTA Countries, each for 197.1 billion cubic feet per year, for a total of 394.2 billion cubic feet per year.

Sierra Club filed a timely request for rehearing, which Energy denied. JA552–55. Sierra Club did not seek judicial review.

### b. Proceedings on Magnolia's Application to Export Additional Volumes of LNG (Proceedings Under Review)

Magnolia applied to the Commission in November 2018 for an amendment to its construction authorization to increase the total production capacity of its facility to 449 billion cubic feet per year. JA081. Magnolia would achieve the increased LNG production capacity by optimizing the facility's final design, but without making any change to the project's planned footprint. JA568. To assess potential environmental effects, the Commission issued a draft Supplemental Environmental Impact Statement ("Supplemental EIS") in September 2019. JA569. Energy participated as a cooperating agency in preparation of the Supplemental EIS. JA570.

Magnolia submitted a new application to Energy in December 2018 for authorization to export to both FTA and non-FTA Countries the additional volumes of LNG made available by the optimization of its facility. JA558–59. In the proceedings on that application, Sierra Club filed neither a motion to intervene nor a protest. Energy granted the requested authorization to export to FTA Countries in March 2019. JA070–81. On

16

April 27, 2022, the same day it approved Golden Pass's application, Energy approved Magnolia's request to export the additional volume to non-FTA Countries on a non-additive basis. JA145–46.

Sierra Club requested rehearing on May 27, 2022, JA586–88, and on June 24, 2022, Energy denied that request on the ground that Sierra Club had not filed a timely protest to the application but had instead waited until rehearing to object. JA160–64.

### 3.    Petitions for Review

On August 22, 2022, Sierra Club petitioned this Court for review of Energy's denial of rehearing of the April 2022 Order increasing the volume of LNG that Magnolia may export to non-FTA Countries (No. 22-1217) and a second petition seeking review of Energy's denial of rehearing of the April 2022 Order increasing the volume of LNG that Golden Pass may export to non-FTA Countries (No. 22-1218). This Court consolidated the petitions on December 23, 2022.

### SUMMARY OF ARGUMENT

1.a. Sierra Club failed to meet its burden to establish Article III standing because it presented no evidence that the Orders will result in injury to its members. Sierra Club's members' alleged injuries all assume an increase in LNG exports from the Companies' facilities. The Orders do not

17

increase the total approved volume of LNG the Companies may export, however; they only increase the number of countries to which export is authorized. Sierra Club has not even tried to show that the Companies would be unable to export the relevant volumes using their existing, unchallenged FTA export authorizations. Thus, Sierra Club has not met its burden to show that air emissions or shipping traffic will increase as a result of the Orders, and Sierra Club's members' alleged injuries therefore cannot be traced to the Orders or redressed by a favorable outcome.

1.b. Apart from Sierra Club's lack of standing, the Court lacks jurisdiction because Sierra Club was not a party to the proceedings leading to the Orders. The Natural Gas Act provides that only a "party to a proceeding" may seek judicial review. 15 U.S.C. § 717r(b). A person other than an applicant can only be made a party to a proceeding by moving to intervene. 10 C.F.R. § 590.303(b). When the Companies filed applications to increase their existing export authorizations, those applications instituted new proceedings. It is undisputed that Sierra Club did not move to intervene in those proceedings, and it does not matter that Energy maintained the record of the proceedings under the same docket number it used for the concluded proceedings on the Companies' initial export applications.

2. If the Court nevertheless determines that it does have jurisdiction, the petitions should be denied. Energy's rules provide only two mechanisms for raising objections to an application: by moving to intervene in opposition or by filing a protest. *Id.* §§ 590.303, .304. Energy's rules also provide that motions to intervene or protests must be filed by the deadline published in the Notice of Application, and that late-filed submissions will be entertained only "for good cause shown." *Id.* §§ 590.303(d), .304(e). Therefore, by failing to protest the applications within the time allowed, Sierra Club forfeited its objections.

Energy's procedural rules and the Notices of Application provided Sierra Club with ample notice that objections not raised by the published deadlines would only be considered for good cause shown. Yet Sierra Club did not argue there was good cause for its tardiness, and in any case there was none. Nor is it sufficient that Sierra Club raised some similar arguments in comments on the Supplemental Environmental Studies, which were developed apart from the proceedings under review. Comments submitted in other administrative processes are no substitute for compliance with Energy's rules in these proceedings. If Energy is to manage its proceedings efficiently and with fairness to all parties, the issues in

controversy must be identified early enough to permit the orderly development of an administrative record prior to a final order.

3.a. If the Court holds that Energy erred in refusing to consider Sierra Club's objections raised for the first time on rehearing, then the proper course is to remand the orders denying rehearing so Energy can address the merits of Sierra Club's arguments. Deciding the two issues identified by Sierra Club will not advance the proceedings because they are intertwined with other arguments Sierra Club raised in its requests for rehearing but does not press in this Court.

3.b.1. Sierra Club's arguments also lack merit. The Supplemental Environmental Studies were either incorporated by reference into the environmental documents prepared by the Commission or were excluded as outside the scope of the NEPA review. Thus, Sierra Club's argument that Energy relied on material outside the NEPA documents is incorrect.

3.b.2. Sierra Club's novel argument that Energy must discuss the possible effects of uncertain increases in domestic greenhouse gas emissions on U.S. emissions reduction targets announced by the President as part of international climate change efforts is without legal foundation. Energy addressed possible export-induced increases in domestic greenhouse gas emissions and reasonably concluded that although

increases were possible, they could not be quantified reliably for a specific project. There was no need for Energy also to discuss that conclusion in the context of the Administration's emissions reduction targets.

## STANDARD OF REVIEW

When reviewing orders under section 19 of the Natural Gas Act (15 U.S.C. § 717r(b)), including to determine whether those orders comply with NEPA, this Court applies the familiar arbitrary and capricious standard. *Freeport II*, 867 F.3d at 203. Under that standard, Energy's orders must be upheld unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency's decision will be considered arbitrary only if "the agency failed to consider relevant factors or made a 'clear error of judgment.'" *Me. Pub. Utils. Comm'n v. FERC*, 454 F.3d 278, 286 (D.C. Cir. 2006) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971)).

## ARGUMENT

**I.    This Court Lacks Jurisdiction to Hear Sierra Club's Petitions.**

### A.    Sierra Club Lacks Article III Standing.

The "irreducible constitutional minimum of standing" requires a litigant to make three showings: that it has suffered a "concrete and particularized" injury that is "actual or imminent," that its injury is "fairly traceable" to the action being challenged, and that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations and internal quotation marks omitted). A petitioner seeking review of agency action in this Court bears the burden of establishing each element of standing based on declarations or other evidence. *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002).

Sierra Club lacks standing because it has failed to show that its members' alleged injuries are traceable to the Orders or will be redressed by a favorable judgment.[5] In declarations appended to Sierra Club's brief, those members assert that their recreational and aesthetic interests will be

---

[5] Sierra Club asserts organizational standing on behalf of its members. SC Br. 33; *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

harmed due to increased ship traffic and air emissions that will result from increased exports made possible by the optimization of the Companies' facilities. SC Br. 33–35. Although those injuries would be cognizable under Article III, Sierra Club has failed to demonstrate that the Orders will lead to increased exports. The Orders do not increase the total volume of LNG the Companies may export, but only increase the number of countries to which exports are authorized. Moreover, they only concern the additional authorized volumes made possible by optimization of the Companies' facilities, as the Companies' initial authorizations to export LNG to non-FTA countries remain in effect. Sierra Club fails to explain how such Orders will lead to an increase in exports and therefore fails to show how its members' alleged injuries could be traceable to the Orders.

Energy authorized the Companies to export LNG to FTA and non-FTA Countries in separate orders. Those orders were issued on a non-additive basis, meaning that the volume of LNG authorized for export to non-FTA Countries is not in addition to the volume authorized for export to FTA Countries (see above, pp. 6–7). As required by statute, 15 U.S.C. § 717b(c), Energy issued orders authorizing the Companies to export their full LNG production volumes to FTA Countries. JA395–96; JA565–66. Thus, the Orders at issue in these petitions only grant the Companies the

23

additional authority to export to non-FTA Countries and only for that fraction of their production capacity made possible by engineering optimization. JA004–05; JA079.

Sierra Club's standing argument entirely fails to address how its members' alleged injuries—premised on increased shipping traffic resulting from an increase in the volume of LNG exported from the facilities—are traceable to the Orders when the FTA orders authorizing equivalent (non-additive) volumes remain in effect.[6] The amount of LNG at issue in the Orders represents about 13.8 percent of the total amount of LNG Golden Pass is authorized to export and about 12.2 percent of the total amount Magnolia is authorized to export. Provided the Companies export at least those fractions of their total approved export volumes to FTA Countries, they would be free under their existing authorizations to export the balance of their production capacity to either FTA or non-FTA Countries.

Because Sierra Club bases its standing on its members' asserted future injuries, it must show a "substantial probability" that the Orders will result in increased air emissions or shipping traffic. *See Fla. Audubon Soc'y*

---

[6] Because the Commission's Environmental Assessment for the Golden Pass construction amendment does not distinguish between exports to FTA and non-FTA Countries, its estimates of increased shipping traffic do not help Sierra Club. *See* SC Br. 33.

*v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996) (en banc). Sierra Club's

declarations provide no evidence that would support such a conclusion, and

that failure alone is enough to defeat its claim of standing. *Util. Workers*

*Union of Am. Loc. 464 v. FERC*, 896 F.3d 573, 579 (D.C. Cir. 2018).

It is of course theoretically possible that the Companies might be

unable to find FTA customers for 13.8/12.2 percent of their approved

export volumes, but Sierra Club has offered no evidence to substantiate that

possibility, and hypothetical allegations of future harm are insufficient for

standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)

("[A]llegations of possible future injury are insufficient." (citation and

internal quotation marks omitted)); *Crete Carrier Corp. v. EPA*, 363 F.3d

490, 494 (D.C. Cir. 2004) ("Speculative and unsupported assumptions

regarding the future actions of third-party market participants are

insufficient to establish Article III standing."). The mere fact that the

Companies sought non-FTA authorizations does not prove the Companies

would export less LNG without those authorizations. Having the ability to

export their full production capacity to non-FTA Countries may give the

Companies added flexibility, but Sierra Club has not shown that without

that flexibility the Companies would be unable to export their full

production volume.

Sierra Club's standing argument is a rerun of its theory in *Sierra Club v. FERC* (*Sabine Pass*), 827 F.3d 59 (D.C. Cir. 2016), but Sierra Club fails to explain why the different facts of this case necessarily yield the same result. In *Sabine Pass*, this Court held that Sierra Club had standing based on injuries that would arise from increased ship traffic caused by LNG exports. *Id.* at 66–67. That case challenged an order by the Commission approving an increase in the production capacity of an LNG terminal. The record in that case showed that shipping the increased volume of LNG would require an increase in the number of tankers serving the facility, resulting in increased aesthetic and recreational injuries to Sierra Club's members. *Id.*

In this case, by contrast, Sierra Club has identified no evidence in the record, nor provided any in its declarations in support of standing, demonstrating a similar relationship between the issuance of a non-FTA export authorization and increased tanker traffic. Sierra Club has not shown that, in the absence of Orders under review, the Companies would be unable to export their full production volume using a combination of their authorizations to export to FTA Countries and their existing authorizations to export to non-FTA Countries. On that key inferential step—that a new, non-additive export authorization to non-FTA Countries will lead to increased ship traffic—Sierra Club's briefing and declarations

26

are silent. Hence, the holding in *Sabine Pass* does not support Sierra Club's standing in this case.

### B. This Court Lacks Jurisdiction Because Sierra Club Was Not a Party to the Proceedings.

Even if this Court concludes Sierra Club has standing, it failed to meet the Natural Gas Act's prerequisites for judicial review by failing to become a party to the proceedings. The Court therefore lacks subject matter jurisdiction to hear Sierra Club's petitions.

As this Court has repeatedly held, a petitioner's failure to comply strictly with the Natural Gas Act's judicial review requirements deprives the Court of jurisdiction. *E.g.*, *Tenn. Gas Pipeline v. FERC*, 871 F.2d 1099, 1109–10 (D.C. Cir. 1989); *ASARCO, Inc. v. FERC*, 777 F.2d 764, 773–74 (D.C. Cir. 1985). Under the Act, only a "party to a proceeding" may seek judicial review. 15 U.S.C. § 717r; *Pub. Serv. Comm'n v. Fed. Power Comm'n*, 284 F.2d. 200, 207 n.11 (D.C. Cir. 1960). The Act does not define "party," but says that Energy, "in accordance with such rules and regulations as it may prescribe," may admit any person as a party "whose participation in the proceeding may be in the public interest." 15 U.S.C. § 717n(e). Accordingly, whether a person is a "party" for purposes of judicial review must be determined by reference to Energy's procedural rules. *See Pub. Serv. Comm'n*, 284 F.2d at 204 (holding that whether a person was a party

to a Natural Gas Act proceeding depended on whether the Commission had granted its petition to intervene).

Under Energy's rules of procedure, a "proceeding" is defined as "the process and activity . . . instituted by [Energy] either in response to an application . . . or on its own initiative, by which [Energy] develops and considers the relevant facts, policy and applicable law concerning the importation or exportation of natural gas and which may lead to the issuance of an order." 10 C.F.R. § 590.102(o). When the Companies filed applications to export additional volumes of LNG, they instituted new proceedings. The rules further provide that "any person," other than an applicant or a state commission, "who seeks to become a party to a proceeding shall file a motion to intervene." *Id*. § 590.303(b). Thus, for Sierra Club to be a party, it needed to move to intervene in the proceedings initiated by these applications.

To establish its status as a party, Sierra Club mainly relies on the fact that it intervened in the proceedings on the Companies' initial export applications. SC Br. 37–38. The proceedings on those applications terminated, however, when Energy issued its final orders because a "proceeding" is a process that "may lead to the issuance of an order." 10 C.F.R. § 590.102(o). The Companies' applications to increase their

28

export volumes were therefore not continuations of the earlier proceedings, but were new proceedings "instituted . . . in response to an application." *Id.*

Sierra Club insists that its earlier intervention was sufficient to make it a party because Energy did not open new dockets for the applications to increase the export volumes. SC Br. 38. "Dockets" and "proceedings" are distinct concepts under Energy's rules, however. A "docket file" contains "the official record upon which all orders . . . shall be based." *Id.* § 590.106. In other words, the docket file contains the administrative record, whereas a "proceeding" is an administrative "process." *Id.* § 590.102(o). As a matter of convenience, Energy regularly maintains the docket files of related proceedings under the same docket number, but that practice cannot override the regulatory definition of "proceeding." Thus, Sierra Club's intervention in the proceedings on the Companies' initial applications did not confer party status for all subsequent applications filed by the Companies.

Sierra Club is correct that Energy did not affirmatively disclaim Sierra Club's status as a party in the Orders, but neither did it admit Sierra Club as a party. Were the issue simply one of agency procedure, Energy's failure to disclaim Sierra Club's party status when denying the request for rehearing might preclude Energy from arguing that Sierra Club is not a party in this

Court. But because Sierra Club's status as a party is a jurisdictional prerequisite under the Natural Gas Act, Energy may not waive the issue. *Tenn. Gas Pipeline Co.*, 871 F.2d at 1107. Under Energy's regulations, Sierra Club was not a party to the proceedings leading to the Orders, and therefore this Court lacks jurisdiction.

## II.    Sierra Club Failed to Raise Its Objection in Accordance with Energy's Rules, and Energy Reasonably Denied Rehearing on that Ground.

Energy's procedural rules unambiguously specify how and when objections to an application must be raised and make clear that late-filed objections will be considered only for good cause shown. Sierra Club cannot justify its position by reference to those rules, so it simply asserts that "[n]o authority supports the Department's position." SC Br. 37. To the contrary, it is Sierra Club's position that cannot withstand scrutiny.

### A.    Energy's Procedural Rules Require Objections to Be Raised in a Timely Protest or Motion to Intervene, Unless Good Cause Is Shown for Late Filing.

#### 1.    The Natural Gas Act Explicitly Grants Energy the Authority to Promulgate Procedural Rules.

The Natural Gas Act specifically provides that Energy may adopt its own rules of practice and procedure. 15 U.S.C. § 717n(f). Energy issued its procedural rules in 1984. 49 Fed. Reg. 35,302 (Sept. 6, 1984). Those rules require persons who object to an application to raise those objections by a

30

published deadline, unless the person can demonstrate good cause for raising objections at a later time. Nothing in those requirements is contrary to the Act, nor are the requirements inherently irrational. Ample authority supports agencies' discretion to impose issue-exhaustion requirements as part of their own procedural rules, and when such requirements exist, courts will enforce them. *E.g.*, *Fleming v. Dep't of Agric.*, 987 F.3d 1093, 1100 (D.C. Cir. 2021); *Vt. Dep't of Pub. Serv. v. United States*, 684 F.3d 149, 157 (D.C. Cir. 2012); *Exxon Corp. v. FERC*, 114 F.3d 1252, 1260 (D.C. Cir. 1997) (upholding the Commission's refusal, in a Natural Gas Act case, to consider new evidence introduced in a request for rehearing).

Energy denied Sierra Club's request for rehearing on the basis of Energy's validly promulgated rules. Sierra Club's argument that "the Natural Gas Act did not require Sierra Club to present arguments to the Department before the rehearing stage," SC Br. 39, thus misses the point. Nor is this a case about whether a reviewing court may consider issues not raised before an agency, so Sierra Club's assertion that exhaustion requirements "are largely creatures of statute," SC Br. 37, is similarly misplaced. The only issue is whether Energy's rules permitted Sierra Club to raise objections for the first time in a request for rehearing without showing good cause for not objecting sooner. They did not.

31

## 2.     Energy's Rules Specify the Method and Time for Raising Objections to an Application.

Energy's rules provide just two methods for a person to object to an application: by filing a "protest" or by moving to intervene in opposition. Sierra Club took neither option and therefore forfeited its right to object to the applications.[7]

The first method of objecting to an application is to file a protest. Any person may file a protest, which must "provide a concise statement of the reasons for the protest." 10 C.F.R. § 590.304(a). Protests must be filed by the deadline given in the Notice of Application, unless Energy permits a late-filed protest "for good cause shown." *Id.* § 590.304(e). Any party may answer a protest within fifteen days unless Energy grants leave to file a late answer, again "for good cause shown." *Id.* § 590.304(f).

---

[7] Sierra Club is incorrect that the preamble to Energy's rules "indicates that filing a protest is only one way a party can lodge its opposition." SC Br. 40. Sierra Club quotes out of context a statement that objections may be raised in a protest or "some other written form." That statement applies only to § 590.108, which determines when a "proceeding" will be considered a "contested proceeding" and thus trigger a prohibition on ex parte communications. 49 Fed. Reg. 35,302, 35,304 (Sept. 6, 1984). That regulation contemplates that the ex parte ban can be triggered before or after the filing of a motion to intervene or protest if "a party otherwise specifically notifies the Assistant Secretary and the other parties in writing of its opposition to the application." *Id.* § 590.108(b); *see also* 46 Fed. Reg. 44,696, 44,697–98 (Sept. 4. 1981) (proposed rule).

Alternatively, a person, other than a "state commission," seeking to become a party to the proceeding must move to intervene. *Id.* § 590.303(a)–(b). The motion must "state, to the extent known, the position taken by the movant and the factual and legal basis for such positions." *Id.* § 590.303(c). Like protests, motions to intervene must be filed by the deadline given in the Notice of Application unless Energy permits late filing "for good cause shown and after considering the impact of granting the late motion." *Id.* § 590.303(d). Again, as with protests, any party may answer a motion to intervene within fifteen days of the motion, unless Energy permits a late filing. *Id.* § 590.303(e).

Energy's rules thus specify the methods by which a person may object to an application, set deadlines for filing objections, and provide notice that late-filed objections will not be considered absent a showing of good cause. Compliance with those rules is essential to the orderly development of the record, and Energy has rejected late protests and motions to intervene when there was no good cause for the late filing. *E.g.*, JA166; JA170–73 (denying late-filed motion to intervene by Sierra Club).

Requiring that objections be raised early in a proceeding "simplif[ies] the decision-making process and expedite[s] the proceedings," 46 Fed. Reg. at 44697, while ensuring "a full and fair disclosure of the facts and issues in

an efficient and timely manner," 49 Fed. Reg. at 35,303. Indeed, the inefficiency inherent in late-raised objections is one of the main reasons exhaustion rules are common among courts and agencies. *E.g.*, *Price v. Barry*, 53 F.3d 369, 371 (D.C. Cir. 1995); *Fleming*, 987 F.3d at 1100; *Vt. Dep't of Pub. Serv.*, 684 F.3d at 157. Late-filed objections also raise fairness concerns by forcing other parties to prepare responses that could have been addressed in their initial submissions.

More importantly, applicants for authorization have a legitimate interest in having Energy decide their application promptly. Raising issues for the first time on rehearing (at least those that, as in this case, could have been raised earlier) only creates delay for applicants with no corresponding benefit to the administrative process. Interpreting Energy's rules to permit such dilatory behavior would conflict with Energy's goal of "minimizing the regulatory burden on all parties and assuring efficiency of the proceedings." 49 Fed. Reg. at 35,302.

None of Sierra Club's superficial interpretive arguments overcome the plain text of the rules. Sierra Club argues that the use of "may" in 10 C.F.R. § 590.304 ("any person objecting to an application . . . may file a protest") should be read to indicate that parties may raise objections in other forms and at other times. SC Br. 40. There is no need for the rules to state

explicitly that other methods of objecting are not permitted, however. When a procedure for taking some action is specified, the usual implication is that the procedure is exclusive. Suppose a hotel cancellation policy said, "reservations may be canceled by sending an email at least 48 hours prior to your scheduled arrival." It would not be reasonable to infer from the use of "may" that reservations could also be canceled by calling one hour before arrival.

Nor is the argument grammatically sound: "may" in this sentence indicates that permission is granted to "[a]ny person," including a person not a party to the proceeding, to file a protest. *Id.* Because the regulation addresses "any person," it would be strange if it were phrased in the imperative. Nor is the argument helped by the fact that the Notices of Application state that "[a]ny person wishing to become a party to the proceeding must file a motion to intervene." SC Br. 41 (quoting JA369; JA563). The purpose of "must" in that sentence is to make clear that the filing of a protest does not suffice to make a person a party. It in no way suggests that a person may object through means other than the filing of a protest or motion to intervene.

Finally, Sierra Club's position that "rehearing is part of, rather than wholly subsequent to, the agency decisionmaking process," SC Br. 38,

35

cannot be reconciled with Energy's rules. A "proceeding" is a process that "may lead to the issuance of an order." 10 C.F.R. § 590.102(o). Energy issues final orders "after completion and review of the record," and those orders must be "based solely on the official record of the proceeding." *Id*. § 590.404. Rehearing, by contrast, is a process by which parties may bring to Energy's attention "alleged errors in the final opinion and order." *Id*. § 590.501. In other words, rehearing is a process for review after the record is complete, and Energy has issued an order explaining its decision.[8] The rules permit parties to raise new issues in an application for rehearing, but *only* for "matters that have arisen since the issuance of the final opinion and order." *Id*. Also, unlike protests and motions, other parties may not respond as of right to an application for rehearing. *Id*. § 590.505. These provisions are simply inconsistent with Sierra Club's view that issues may be raised freely for the first time on rehearing.

The cases on which Sierra Club relies—all of which concerned the Commission, not Energy—do not say otherwise. In *Gulf South Pipeline Co.*

---

[8] The preamble to the final rule notes that Energy "has a number of approaches available to it for advancing a proceeding, building a record, and resolving disputed issues of fact, law and policy," including "the filing of written comments and replies, conferences (§ 590.311), oral presentations (§ 590.312), and trial-type hearings (§ 590.313)." 49 Fed. Reg. at 35,303. Notably absent from that list is an application for rehearing.

*v. FERC*, 955 F.3d 1001 (D.C. Cir. 2020), the petitioner raised a new argument in support of its requested rate for the first time on rehearing and the Commission exercised its discretion to address the forfeited argument on the merits. On review, the Commission argued that the Court lacked jurisdiction to consider the petitioner's argument because the petitioner had not filed a second request for rehearing on the Commission's disposition of the new issue. This Court disagreed that a second request for rehearing was required and held that it had jurisdiction. *Gulf S. Pipeline Co.*, 955 F.3d at 1012 n.2. The Court did not hold the Commission was required to consider the petitioner's new arguments on rehearing.

*Minisink Residents for Environmental Preservation and Safety v. FERC*, 762 F.3d 97 (D.C. Cir. 2014), addressed an entirely different factual situation. In that case, the petitioners vigorously opposed the project in proceedings leading to the final order, but argued the Commission's refusal to share privileged documents deprived them of the ability to support their arguments fully. *Id.* at 115. This Court rejected that argument, noting that the petitioners received the documents before the rehearing deadline and thus could have used them in their application for rehearing. *Id.* The Court did not suggest that a party may wait until rehearing to introduce entirely new objections.

*Blumenthal v. FERC*, 613 F.3d 1142 (D.C. Cir. 2010), is similarly unhelpful. In that case, the State of Connecticut challenged the reasonableness of executive compensation rates proposed by the applicant. The applicant responded by providing more data. *Id.* at 1144. On judicial review, Connecticut argued that its due process rights were infringed because it had no chance to respond to the new data before the Commission rendered its decision. *Id.* at 1146. This Court held there was no due process violation because Connecticut addressed the data in its application for rehearing and the Commission considered its arguments "thoroughly." *Id.* The Court did not hold that a due process violation would have occurred had the Commission declined to consider Connecticut's arguments, and it certainly did not hold that rehearing is generally an appropriate time to introduce new issues.

\*　\*　\*　\*　\*

Energy's rules provide two methods for lodging objections to an application and two methods only. Nothing in the text of the rules, their purpose, or Energy's past application of them suggests that objections may be raised by other means. By failing to file a timely protest or motion to intervene, Sierra Club forfeited its objections.

### 3.    Even If Energy's Rules Are Ambiguous, Energy's View Is Entitled to Deference.

The text and purpose of Energy's rules unambiguously show that objections must be raised in a timely protest or motion to intervene and that Energy will only consider late submissions for "good cause shown." If the Court disagrees that the rules clearly preclude parties from raising issues for the first time on rehearing, however, then the rules are at least ambiguous on that point, and the Court should defer to Energy's reasonable interpretation of its own procedural rules. *See Fried v. Hinson*, 78 F.3d 688, 691 (D.C. Cir. 1996) ("An agency is entitled to 'a measure of discretion in administering its own procedural rules in such a manner as it deems necessary.'" (quoting *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970)).

The Supreme Court recently reaffirmed that agencies' reasonable interpretations of their own ambiguous regulations are entitled to deference. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019). Such deference applies only when a regulation is "genuinely ambiguous," *id.* at 2415, but in this case, if the Court concludes that Energy's rules are not clear that issues raised for the first time on rehearing are forfeited, then the rules' silence on how such issues will be treated at least creates ambiguity. *See Barnhart v. Walton*, 535 U.S. 212, 218 (2002) ("[S]ilence, after all, normally creates

39

ambiguity. It does not resolve it."); *Tenet HealthSystems HealthCorp. v. Thompson*, 254 F.3d 238, 248 (D.C. Cir. 2001).

Energy's construction is also reasonable. There can be no real dispute that allowing persons to raise objections for the first time on rehearing would cause unnecessary delay and lead to duplicative work for Energy and the parties. Indeed, Energy's rules require persons to present their views early in a proceeding to promote efficiency, and Sierra Club can point to no text in the rules or historical practice suggesting that objections may be raised freely for the first time on rehearing. Thus, if the Court finds the rules to be ambiguous, Energy's interpretation is entitled to deference.

## B. Sierra Club Had Adequate Notice That It Had to Present Its Arguments in a Timely Protest or Motion to Intervene.

Sierra Club's last defense is that it did not have adequate notice that it could not raise objections for the first time on rehearing. SC Br. 41. But as explained above, Energy's rules provide ample notice that objections must be raised in a timely protest or motion to intervene, as did the Notice of Application. Nor is Sierra Club unaware that Energy enforces deadlines for filing protests or motions to intervene because Energy has in the past denied Sierra Club's own out-of-time motion to intervene and protest for failure to establish good cause. JA170–73, *reh'g denied* Order 2961-B (Jan

25, 2013). Any reasonable participant in Energy's proceedings, especially a sophisticated, repeat participant like Sierra Club, would have been aware that forfeiture was—at the very least—a strong possibility.

The only authority Sierra Club cites for its notice argument is Justice O'Connor's concurring opinion in *Sims v. Apfel*, 530 U.S. 103 (2000), which no other Justice joined. Addressing whether the petitioner waived arguments she had not first presented to the agency, Justice O'Connor opined, "the agency's failure to notify claimants of an issue exhaustion requirement in this context is a sufficient basis" for declining to impose one. *Id*. at 113. That "context" was an inquisitorial Social Security Administration proceeding in which claimants are often unrepresented. *Id*. at 112. Importantly, Justice O'Connor also noted that the relevant "regulation and procedures . . . affirmatively suggest that specific issues need not be raised before the [agency]." *Id*. at 113. Energy's rules, by contrast, provide time limits for raising objections and do not "affirmatively suggest" that issues may be raised for the first time on rehearing. Justice

O'Connor's concurrence in *Sims* is thus scant support for Sierra Club's position.[9]

Finally, the fact that these proceedings are the first time Energy has conclusively addressed whether a person that fails to file a timely protest or motion to intervene may nonetheless raise objections for the first time on rehearing does not prevent Energy from applying its decision to Sierra Club in these proceedings. Agencies engaged in adjudication must sometimes decide issues of first impression, including procedural issues, and their decisions in such cases should ordinarily be applied to the parties before them. *Am. Tel. & Tel. Co. v. FCC*, 454 F.3d 329, 332 (D.C. Cir. 2006); *Clark-Colwitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1082 (D.C. Cir. 1987) (en banc). Sierra Club did not argue in its opening brief that any exception to this rule applies in this case, and it has therefore forfeited any

---

[9] Sierra Club cites *Ramsey v. Commissioner of Social Security*, 973 F.3d 537, 543 (6th Cir. 2020), for the proposition that Justice O'Connor's *Sims* opinion "controls" under *Marks v. United States*, 430 U.S. 188 (1977). Under this Court's interpretation of *Marks*, however, Justice O'Connor's opinion is not binding. In this Circuit, *Marks* applies "only when one opinion is a logical subset of other, broader opinions." *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc). When the opinions of justices forming the majority do not overlap in that way, the case "provides no controlling legal holding." *Id*. at 784. In *Sims* there was no logical overlap between Justice O'Connor's view that the case should be decided on notice grounds and the plurality's view that an issue exhaustion requirement was inappropriate given the inquisitorial nature of Social Security proceedings.

such argument. *See INEOS USA LLC v. FERC*, 940 F.3d 1326, 1329 (D.C. Cir. 2019). In any event, under this Court's precedents, there would be no basis for limiting Energy's ruling to prospective effect. For the reasons stated above, Sierra Club had no grounds to rely on an opportunity to raise new issues on rehearing, and any burden on Sierra Club will be limited, as Sierra Club will presumably not commit the same procedural default twice. There is thus no "manifest injustice" in applying Energy's ruling to these rehearing requests. *Clark-Colwitz*, 826 F.2d at 1081–82.

### C. Sierra Club Did Not Show Good Cause for Its Tardy Objections, and Energy Acted Reasonably by Refusing to Consider Them.

#### 1. There Was No "Good Cause" for Sierra Club to Wait Until Rehearing to Raise Its Arguments.

Sierra Club acknowledges that it waited until rehearing to raise its arguments regarding President Biden's 2021 climate actions and the invasion of Ukraine, but says that it could do so because there was "self-evident good cause" for the delay. SC Br. 46. Sierra Club is wrong for two reasons: First, if Sierra Club thought there was good cause, it needed to present that argument to Energy in its request for rehearing; parties cannot arrogate to themselves authority to determine when good cause exists. Second, there was no good cause; Sierra Club could have presented its

arguments about executive climate action before issuance of a final order, and its arguments regarding Ukraine grossly misread the Orders.

Sierra Club is correct that Energy has the discretion to entertain arguments raised for the first time on rehearing if there is good cause. *Whether* good cause exists, however, is a determination for Energy to make, and Sierra Club must present its case for good cause to Energy. 10 C.F.R. § 590.304(e) (providing that protests may be filed late for good cause *shown*). Sierra Club's request for rehearing contains no such justification. Moreover, because the Natural Gas Act requires that arguments be presented in a request for rehearing as a prerequisite to this Court's jurisdiction, 15 U.S.C. § 717r, Sierra Club's failure to argue good cause in its rehearing requests precludes this Court from considering the argument now. *ASARCO*, 777 F.2d at 773.

Forfeiture aside, there was no good cause. President Biden issued Executive Order 14,008 on January 27, 2021, 86 Fed. Reg. 7,619, and announced a commitment to reduce U.S. carbon emissions on April 22,

2021.[10] Energy issued the Orders on April 27, 2022. As Sierra Club acknowledges, "[t]he Department's regulations expressly provide that new arguments can be presented after the initial protest period where there is good cause to do so." SC Br. 46. Sierra Club thus had more than a year to bring those developments to Energy's attention by moving to file a late protest for good cause, but did not. Sierra Club is therefore wrong to claim, "there was no way for Sierra Club to raise these issues prior to rehearing." SC Br. 48.

Sierra Club's arguments regarding the Orders' reference to the invasion of Ukraine are just as weak. Sierra Club asserts that Energy "rel[ied] on Russia's invasion of Ukraine," SC Br. 47, to determine the authorizations were not contrary to the public interest, but that mischaracterizes Energy's rationale. The following is the *entire* discussion of Ukraine in the Orders:

> An efficient, transparent international market for natural gas with diverse sources of supply provides both economic and strategic benefits to the United States and our allies. *For example*, in light of the recent Russian invasion of Ukraine, there are renewed concerns about energy security for Europe

---

[10] https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/22/fact-sheet-president-biden-sets-2030-greenhouse-gas-pollution-reduction-target-aimed-at-creating-good-paying-union-jobs-and-securing-u-s-leadership-on-clean-energy-technologies/. Sierra Club dates the announcement to November 13, 2021, SC Br. 28, but that announcement merely restated the April announcement.

and Central Asia, particularly given the relative share of
Russian natural gas supplies into those regions. By authorizing
additional exports to non-FTA Countries, including to U.S.
allies *in Europe and elsewhere*, this Order will enable Golden
Pass LNG to help mitigate energy security concerns once it
begins exporting U.S. LNG. More generally, to the extent U.S.
exports diversify global LNG supplies and increase the volumes
of LNG available globally, these additional exports will improve
energy security for *many U.S. allies and trading partners*.
Therefore, we find that authorizing Golden Pass LNG's
requested increase in exports will advance the public interest
for reasons that are distinct from and additional to the
economic benefits identified in the 2018 LNG Export Study and
[Energy]'s prior macroeconomic studies.

JA042–43 (footnotes omitted) (emphasis supplied).[11] Energy's rationale

was that "additional exports will improve energy security for many U.S.

allies and trading partners," not just in Europe and not just in response to

the invasion of Ukraine, which was simply referenced as an "example."

Contrary to Sierra Club's arguments, Energy never made any conclusions

about the role of U.S. LNG exports in "Europe's . . . efforts to reduce

reliance on Russian gas," SC Br. 14, and Energy's rationale would be sound

even if the passing reference to Ukraine were omitted.

    Nor should Energy's consideration of international energy security

have surprised Sierra Club. Energy has relied on similar energy security

---

[11] Identical language, except for the name of the company, appears in the
Magnolia Order. JA131.

benefits in other proceedings, some of which Sierra Club participated in. *E.g.*, JA210; JA212–13; JA230–31. Sierra Club thus had notice that Energy might address international energy security in the Orders and had ample opportunity to present its objections in timely protests. The mere fact that Energy may have averted to a current example as an illustration does not create good cause for Sierra Club to introduce lengthy new arguments that are mainly directed at a position Energy did not take.

> **2.    Sierra Club's Comments on Studies Are Not an Adequate Substitute for Raising Objections to an Application.**

As a fallback, Sierra Club argues that its failure to object in these proceedings is unimportant because it made similar points in its comments on the Supplemental Environmental Studies and in proceedings on other applications. SC Br. 42–46. That argument misunderstands the question at issue, which is not whether Energy had some awareness that Sierra Club disagrees with how Energy has addressed certain issues in export proceedings, but whether Energy acted arbitrarily in refusing to entertain Sierra Club's arguments on rehearing when Sierra Club failed to make those arguments by the deadlines set out in Energy's rules.

As the Supreme Court has observed, "no adjudicative system can function effectively without imposing some orderly structure on the course

47

of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006). Energy's rules are designed to allow proceedings to be conducted fairly and efficiently, and the timely identification of all issues in controversy is essential to achieving those goals. A necessary corollary of an agency's authority to set its own procedural rules is the power to enforce those rules, and an agency does not act arbitrarily when it enforces its rules strictly. *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1221 (D.C. Cir. 1999); *Green Country Mobilephone, Inc. v. FCC*, 765 F.2d 235, 237 (D.C. Cir. 1985).

Whether Sierra Club had raised similar concerns in other proceedings is therefore irrelevant to the question whether Energy acted arbitrarily in refusing to consider Sierra Club's untimely objections.[12] The question depends solely on whether Energy correctly, or at least reasonably, interpreted its procedural rules and applied them to the facts of these proceedings. Energy did so, and the Court should end its analysis there.

---

[12] Sierra Club's reliance on *Delaware Riverkeeper Network v. U.S. Army Corps of Engineers*, 869 F.3d 148 (3d Cir. 2017), is therefore misplaced. In that case, the Third Circuit addressed whether it could consider an argument on judicial review that was not raised in comments on a permit application, but that the Corps was otherwise made aware of in the proceeding, and held that it could. *Id*. at 156. The court did not hold that an agency must consider objections that are untimely under the agency's rules if similar objections were made in related proceedings.

Beyond the procedural point, Sierra Club is wrong that making comments in other proceedings, even related proceedings, is an adequate substitute for raising specific objections to the specific applications under review. To justify flouting Energy's rules, Sierra Club relies on comments it made on the Addendum in 2014, on the Golden Pass draft EIS in 2016, and on the 2019 Update to the Life Cycle Analysis. Energy (or, in the case of the EIS, the Commission) responded to those comments at the time they were made, and had every reason to consider that the end of the matter unless Sierra Club signaled its continued disagreement by filing a protest. Indeed, the Federal Register notices for the Companies' applications specifically instructed "parties that may oppose" the applications to address those studies in their protests. JA386; JA563.

The system Sierra Club proposes, in which Energy must review every comment on every study in the administrative record and consider whether to readdress them in a particular final order, would be unworkable. If Energy is to complete its work efficiently, and with due regard for the interests of applicants and other parties, it needs to be able to consider matters addressed in the past to be closed, unless a party renews its objections. *Cf. ASARCO*, 777 F.2d at 773 ("FERC's complex and multi-party proceedings would soon overwhelm the system if agreed-upon settlements

49

and acquiesced-in agency dispositions were not the rule rather than the exception."). Providing notice that there is a continuing dispute on an issue allows Energy to develop the record further, other parties to respond, and Energy to revise its position, if appropriate. Deferring objections until after a final order is issued could require Energy to go back, re-open the record, and re-do work that went into the order. And even if the additional (but unnecessary) work were minimal, deferring objections would inevitably prejudice other parties to the proceeding by introducing delay that could have been avoided by a timely protest.

### III. The Court Should Decline to Address, or Reject, Sierra Club's Piecemeal Challenges to the Export Orders.

#### A. If the Court Determines that Energy's Denial of the Request for Rehearing Was Arbitrary, It Should Remand Without Vacating the Authorizations.

If the Court nonetheless holds that Energy erred by declining to consider the merits of Sierra Club's requests for rehearing, the proper remedy is for the Court to remand the Orders so Energy can address in the first instance Sierra Club's arguments for granting rehearing. *See Venetian Casino Resort, LLC v. Nat'l Lab. Rels. Bd.*, 793 F.3d 85, 92 (D.C. Cir. 2015) (remanding to permit the agency to address in the first instance arguments that its previous decision had not considered). Sierra Club does not dispute that remand will be necessary if Energy's procedural ruling is found

50

arbitrary. *See* SC Br. 48 (asking the Court to consider only "some" of its arguments on rehearing). It asks the Court, however, to take the unusual step of deciding two of its challenges to the Orders now and to vacate the Orders. The Court should entertain neither request.

First, Sierra Club contends that two issues it raised on rehearing are fit for judicial review now because they are legal questions, SC Br. 48–49, but neither is a pure question of law. Both require the Court to apply law— NEPA and the Administrative Procedure Act, respectively—to the specific facts in the administrative records. And even if they were pure issues of law, Energy should have the opportunity to address and respond to Sierra Club's position and explain its interpretation of those legal requirements in the first instance. Doing so would allow Energy to address the relevant policy considerations and would promote judicial efficiency by ensuring that the Court only reviews the merits of the authorizations once. And, contrary to Sierra Club's assertion, SC Br. 49, the Court's consideration of the issues "would be aided by further application of the agency's position to particular facts." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002).

Resolution of the issues is also tied up with the resolution of other arguments Sierra Club raised in its requests for rehearing but does not advance in this Court. For example, whether Energy violated NEPA in the

way it incorporated the Supplemental Environmental Studies could
depend, in part, on whether Energy lawfully concluded that inherent
uncertainties precluded it from addressing upstream and downstream
environmental effects in more detail. Similarly, the question whether the
potential effect of the authorizations on the United States' ability to meet
domestic emissions reduction targets is "an important aspect of the
problem" that must be addressed under *State Farm,* 463 U.S. at 43,
depends on other aspects of the analysis, including Energy's determination
that upstream greenhouse gas emissions could not be quantified.

Second, there is no need to vacate the authorizations. Both issues
Sierra Club asks this Court to address are procedural, and Sierra Club offers
no reason to think that Energy will be unable to substantiate its decisions
on remand. *See Allied-Signal Inc. v. Nuclear Regul. Comm'n*, 988 F.2d 146,
151 (D.C. Cir. 1993). Sierra Club may be correct that vacatur would not be
unduly disruptive because the Companies will not begin exporting LNG
immediately, but by the same token there is no need to vacate the Orders
when doing so would have no practical consequences. Remand without
vacatur is therefore an adequate remedy.

**B.     Sierra Club's NEPA and *State Farm* Arguments Do Not Show the Orders Were Arbitrary.**

If the Court does decide to address Sierra Club's NEPA and *State Farm* arguments now, it should deny the petitions because Sierra Club's arguments lack merit.

**1.     Energy Properly Incorporated the Supplemental Environmental Studies into Its NEPA Analysis.**

Sierra Club argues that Energy violated NEPA by relying on the Supplemental Environmental Studies as part of its environmental review without formally incorporating those studies by reference into the "NEPA documents." SC Br. 50. Although it recites alleged deficiencies in the studies, the only challenge Sierra Club raises in its brief is whether Energy was able to rely on those studies in fulfilling its NEPA responsibilities. *Id*. at 49. That challenge fails because Energy properly incorporated the Supplemental Environmental Studies by reference or explained why the studies were not relevant.

Contrary to Sierra Club's suggestion, the Supplemental Environmental Studies are incorporated by reference into the Golden Pass environmental documents. The Golden Pass Environmental Assessment does not directly reference the Supplemental Environmental Studies because that document only addresses environmental impacts specific to

the increased export amounts. JA373–74 For impacts associated with the project more broadly, including greenhouse gas impacts, the Environmental Assessment "tiers" from the earlier Environmental Impact Statement. *Id.*; *see also* 40 C.F.R. § 1502.20 (2019) (discussing "tiering"). Sierra Club acknowledges that such tiering is appropriate. SC Br. 11.

The Golden Pass EIS explains why upstream and downstream effects were deemed too difficult to estimate for a quantitative analysis to be meaningful, and that discussion incorporates the Addendum and the 2014 Lifecycle Analysis by reference. JA614–15, 618, 624–25. In addition, the 2019 Update to the Life Cycle Analysis is incorporated by reference, along with the other Supplemental Environmental Studies, into the Golden Pass Finding of No Significant Impact, which is also a NEPA document.[13] JA062–63. The EIS and Finding of No Significant Impact provide citations and hyperlinks to the studies, and "briefly describe" the studies and how they support the analysis. The NEPA regulations require no more. 40 C.F.R. § 1502.21 (2019).

---

[13] Sierra Club does not explain what it means by "NEPA documents," *e.g.*, SC Br. 50, but presumably they are the same as "environmental documents," which are defined at 40 C.F.R. § 1508.10 (2019) to include environmental assessments, environmental impact statements, findings of no significant impact, and notices of intent.

Sierra Club may object that the documents should have included fuller summaries of the Supplemental Environmental Studies, but that is surely flyspecking. *Freeport II*, 867 F.3d at 196. The Golden Pass EIS and Finding of No Significant Impact put the public on notice of the Studies' contents and provided information on where they could be found.[14] They thus fulfilled their purpose of fostering "informed public comment and informed decisionmaking." *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017); *Mayo v. Reynolds*, 875 F.3d 11, 20 (D.C. Cir. 2017).

Like the Golden Pass Environmental Assessment, the Magnolia Supplemental Environmental Impact Statement tiered off the Magnolia EIS, and like the Golden Pass EIS, the Magnolia EIS incorporated by reference the 2014 Life Cycle Analysis. JA489. The Magnolia EIS declined to incorporate the Addendum, however, explaining that while the Addendum "made broad projections about the types of resources from which additional production may come, . . . [Energy] cannot meaningfully analyze the specific environmental impacts of such production" and that therefore such effects were outside the scope of the NEPA analysis. JA491;

---

[14] DOE examined the Supplemental Environmental Studies that informed DOE's obligation under section 3(a) of the Natural Gas Act to consider whether a proposed export of natural gas "will not be inconsistent with the public interest," forming, in part, the basis on which DOE issued its Order.

*see also* JA477. This Court upheld the same conclusion based on the Addendum and 2014 Life Cycle Analysis in another LNG export proceeding. *See Freeport II*, 867 F.3d at 200 (upholding Energy's conclusion that attempting to quantify upstream environmental impacts "would not provide meaningful information"). Although Energy referenced the Addendum in the Record of Decision, it reiterated that the Addendum was "not required by NEPA."[15] JA546.

The exclusion of the Addendum from the Magnolia EIS was not arbitrary, however, because the EIS explains why environmental effects of induced natural gas production were excluded from the review. JA477–78, 491. Sierra Club has not challenged the adequacy of that explanation in its brief, so the Court should decide on that basis whether the Addendum nonetheless needed to be incorporated into the Magnolia environmental documents.

Even if Energy's incorporation of the Supplemental Environmental Studies were deficient, that procedural error would be harmless. In *Friends*

---

[15] The Magnolia EIS and Supplemental EIS do not incorporate by reference the 2019 Update because that document was not finalized until around the same time as the Supplemental EIS. Energy did, however, consider the 2019 Update as part of its Amended Record of Decision for the Magnolia authorization and incorporated it by reference into that document along with the earlier studies. JA155.

*of the River v. FERC*, 720 F.2d. 93 (D.C. Cir. 1983), the Court held that although an EIS's analysis of an issue "did not measure up to NEPA's command," remand was not required because the Commission investigated the issue, received and responded to comments from the public, and presented a sufficient analysis in an order on rehearing. *Id.* at 106. More recently, the Court reached the same result in *Natural Resources Defense Council v. Nuclear Regulatory Commission*, 879 F.3d 1202, 1210–11 (D.C. Cir. 2018), which also involved the supplementation of an EIS during a subsequent hearing. *Id.* at 1210–11 (relying on *Friends of the River*). The facts of the proceedings under review weigh even more strongly in favor of finding any error harmless. In preparing the Supplemental Environmental Studies, Energy informed the public of its purposes in preparing the Studies, solicited public comments on drafts of the studies, responded to the comments received, and incorporated the studies, comments, and responses into the administrative records. And unlike in *Friends of the River*, Sierra Club had ample opportunity to raise objections to the studies by filing timely protests to the applications (but chose not to do so).

It also bears repeating that this Court has previously upheld the substance of Energy's analysis of the indirect and cumulative effects of LNG exports as set forth in the Addendum and 2014 Life Cycle Analysis.

57

*Freeport II,* 867 F.3d at 201–02. Sierra Club's only argument in these petitions is that it was improper for Energy to rely on the Supplemental Environmental Studies because they were not properly incorporated into the NEPA analysis. Even if Sierra Club were correct on the procedural point—and as the foregoing demonstrates, it is not—that error would be harmless because there is no reason to think it would have affected the outcome. That being the case, "a remand for the agency to update its EIS and repeat [its] unchallenged findings would be utterly pointless." *Oglala Sioux Tribe v. Nuclear Regul. Comm'n*, 45 F.4th 291, 301 (D.C. Cir. 2022) (citation and internal quotation marks omitted).

### 2. Energy Was Not Required to Assess the Potential Effect of the Orders on Domestic Greenhouse Gas Reduction Targets.

Finally, the Court should reject Sierra Club's novel argument that Energy was required "as a matter of law" to discuss the potential effects of increasing the volume of LNG the Companies are authorized to export to non-FTA Countries on the United States' ability to meet the targets for the reduction of domestic greenhouse gas emissions announced by President Biden. SC Br. 55–58. Although Energy must consider all important aspects of the problem, *State Farm*, 463 U.S. at 43—including the potential for increases in greenhouse gas emissions—how it does so is within its

58

discretion, and Energy was not required to address the potential effects of the Orders specifically in terms of the Administration's domestic greenhouse gas reduction targets.

In the Orders, Energy considered whether approving the increased export authorizations would increase domestic greenhouse gas emissions because of increased production. Energy concluded that while an increase in greenhouse gas emissions is possible, the amount of any increase is uncertain.[16] JA044–45; JA133–34. Energy also concluded that, considering the projected economic and international benefits of increased exports, denying the applications "would be too blunt an instrument to address these environmental concerns efficiently." JA045; JA134. Energy therefore adequately explained why it was not addressing domestic greenhouse gas emissions in greater detail. Sierra Club cites no authority requiring Energy to address those uncertain effects specifically in the context of the Administration's emissions reduction targets, nor does Sierra Club explain

---

[16] Sierra Club represents that "producing the gas to supply [exports authorized to date] will collectively increase domestic emissions by 114 million metric tons of carbon dioxide equivalent per year." SC Br. 57. That analysis assumes that all approved authorizations will actually be put into use, that all the gas exported will come from additional production (rather than from decreased domestic consumption), and that absent exports domestic production would otherwise remain constant. All those assumptions are very much uncertain.

how such a discussion would be meaningful when Energy had concluded that emissions increases could not be estimated reliably for specific projects. *Cf. Freeport II*, 867 at 200 (upholding Energy's decision not to quantify effects when doing so would not provide meaningful information).

Given Energy's conclusions that the amount of upstream greenhouse gas emissions was uncertain, there was no need for Energy to address domestic emissions reduction targets separately, particularly in the absence of a timely protest bringing that issue to Energy's attention. Indeed, Executive Order 14,008, from which the domestic greenhouse gas reduction target is derived, expressly states that "[n]othing in this [Executive] Order shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency." 86 Fed. Reg. at 7632. Energy's consideration of domestic greenhouse gas emissions was therefore well within its discretion, and should be upheld.

## CONCLUSION

For these reasons, the petitions for review should be dismissed for lack of jurisdiction or, alternatively, denied.

60

Respectfully submitted,

/s/ Christopher Anderson

TODD KIM

Of counsel:                      *Assistant Attorney General*

                                 JUSTIN D. HEMINGER

BETTINA MUMME                    CHRISTOPHER ANDERSON
 *Attorney*                       *Attorneys*
Office of General Counsel        Environment & Natural Resources Div.
U.S. Department of Energy        U.S. Department of Justice
                                 Post Office Box 7415
                                 Washington, DC 20044
June 8, 2023                     (202) 353-1834
DJ 90-13-5-16651                 christopher.anderson3@usdoj.gov

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 21(d)(1) because it contains 12,941 words, excluding the parts exempted under Federal Rule of Appellate Procedure 32(f) and D.C. Cir. R. 32(e).

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), as required by Federal Rule of Appellate Procedure 27(d)(1)(E), because it has been prepared in a proportionally spaced typeface (14-point Georgia font) using Microsoft Word.

 s/ Christopher Anderson
CHRISTOPHER ANDERSON

Counsel for Appellees

**CERTIFICATE OF SERVICE**

I, Christopher Anderson, certify that on June 8, 2023, I electronically

filed the foregoing document using the Court's CM/ECF system, which will

send notification of such filing to counsel of record.


 s/ Christopher Anderson
CHRISTOPHER ANDERSON

Counsel for Appellees